AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

DISTRICT OF Columbia

Ransom

V.

Dorko et. al.

## EXHIBIT AND WITNESS LIST

Case Number: 1:23-CV-2601-RC

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Judge Contreras | none | unknown |
| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |
| | | |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| A | | | | | Removal Proposal |
| B | | | | | Mutual Separation and General Release |
| C | | | | | October 17, 2019 Mutual Separation and General Release Response |
| D | | | | | HS-FEMA-01522-2019 |
| E | | | | | HS-FEMA-01522-2019 Postage Envelope |
| F | | | | | HS-FEMA-01522-2019 Nov 27, 2019 Update |
| G | | | | | HS-FEMA-01522-2019 Dec 2 2019 Update |
| H | | | | | April 14, 2020 Neal Email and Letter |
| I | | | | | July 8, 2020 Neal Email and Letter |
| J | | | | | ROI 991 |
| K | | | | | HS-FEMA-01522-2019 FAD |
| L | | | | | HS-FEMA-01522-2019 Objection to Claims |
| M | | | | | Ransom MSPB Appeal |
| N | | | | | Ransom MSPB Acknowledgement Order |
| O | | | | | 1:21-CV-01563 JMC Memorandum of Law in Opposition to Motion to Dismiss or Transfer |
| P | | | | | Prehearing Submission |
| Q | | | | | 2021000075 EEOC Acknowledgement Letter |
| R | | | | | 202204160 EEOC Acknowledgment Letter |
| S | | | | | 2022000766 Updated EEO Complaint 1.4 |
| T | | | | | Kevin Langley February 6, 2020 Deposition Testimony |
| U | | | | | Keith Johnson February 5, 2020 Deposition Testimony |
| V | | | | | Georgia Baione February 4, 2020 Deposition Testimony |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

AO 187A (Rev. 7/87)

# EXHIBIT AND WITNESS LIST – CONTINUATION

| Ransom | | vs. | | | Dorko et. al. | CASE NO. 1:23-CV-2601-RC |
|---|---|---|---|---|---|---|
| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES | |
| W | | | | | Termination SF-50 | |
| Y | | | | | HS-FEMA-01742-2021 Notice of Partial Acceptance | |
| Z | | | | | 20220000766 EEOC Acknowledgement Letter | |
| AA | | | | | 1:22-CV-02355-GLR Pro Se 7 | |
| AB | | | | | 1:22-CV-02355-GLR September 15, 2022 Statement of Facts | |
| AC | | | | | 1:22-CV-02355-GLR November 17, 2022 Updated Statement of Facts | |
| AD | | | | | 1:22-CV-02355-GLR April 11, 2023 Updated Statement of Facts | |
| AF | | | | | 1:22-CV-02355-GLR Memorandum of Law in Opposition to Motion to Dismiss or TransferAG | |
| AG | | | | | 1:22-CV-02355-GLR Civil Cover Sheet | |
| AH | | | | | 1:21-CV-01563-JMC Complaint | |
| AI | | | | | 1:21-CV-01563-JMC June 23, 2021 Statement of Facts | |
| AJ | | | | | 1:22-CV-01563-JMC June 23, 2021 Statement of Facts | |
| CH | | | | | 1:21-CV-01563-JMC Pro Se 7 | |
| CJ | | | | | 1:21-CV-01563-JMC Civil Cover Sheet | |
| CO | | | | | Langley APM Panel Selection Remarks | |
| CP | | | | | Agency File, pp. 100, 135 | |
| CQ | | | | | Motion to Amend Pleading | |
| CR | | | | | Memorandum in Suport of Motion to Amend Pleading | |
| CS | | | | | Amended Complaint | |
| CT | | | | | 1:22-CV-02355-GLR July 14, 2023 Updated Statement of Facts | |
| CU | | | | | ROI,pp. 455-457 | |
| #1 | | | | | Attachment #1: MSPB Decision | |
| #2 | | | | | Attachment #2: EEOC Decision 2021000075 | |
| #3 | | | | | Attachment #3: EEOC Decision 2022000766 | |
| #4 | | | | | Attachment #4: 1:21-01563-JMC Order | |
| | | | | | | |
| | | | | | | |

**In The Matter Of:**

*EYPHRA RANSOM vs.*

*DEPARTMENT OF HOMELAND SECURITY*

---

*DEPOSITION OF KEVIN LANGLEY*

*February 6, 2020*

---

*COURT REPORTERS, ETCetera, INC.*

*"We'll cover your job ANYWHERE in the country!"*

*2833 Smith Avenue, #260*

*Baltimore, Maryland  21209*

*(410) 653-1115   1-800-947-DEPO    (202) 628-DEPO (3376)*



*"We'll Cover Your Job ANYWHERE in the Country!"*

Original File LANG0206.TXT

Min-U-Script® with Word Index

Exhibit T

values or -- what they normally want you to do. So we just want to know what you did specifically unless we ask you differently.

The other thing that -- besides information is admissions. We want you to admit parts of our case that you can agree with. That tends to reduce the case volume so that we can get a hearing done in a reasonable amount of time.

Obviously, given the complexity of some of the facts here, we could spend, you know, weeks in front of a judge trying to paint the full picture. Where we can reach agreements about, you know, whether something was done right, wrong, otherwise, then I think that will help the judge narrow the issues and make it go quicker.

So I'm going to begin with your background. Let's get your position.

A. Director, logistics Systems Division.

Exhibit T

Q. And that's part of the logistics management directorate?

A. Yes.

Q. So you're the director of what you guys commonly call LSD?

A. Yes.

Q. And you work for an assistant administrator, a deputy assistant administrator, who is over LMD; is that right?

A. The deputy to the AA, yes.

Q. Which is over LMD?

A. Yes.

Q. Logistics management --

A. Yes.

Q. Okay. We've got to get you into good habits here, so speak up just a little bit because I don't want Steven to miss these words.

When he's going back to review the transcript for accuracy, he's dependent

Exhibit T

on everything that came through this microphone.

MR. NEAL: So, I don't know, do you want to move it closer to him?

THE COURT REPORTER: No, we're good.

MR. NEAL: It's coming in good?

THE COURT REPORTER: Yes, thank you.

BY MR. NEAL:

Q. All right. Now, at the time that Eyphra was working at FEMA, you had a different position, right?

A. Yes.

Q. And what was the name of that position?

A. Deputy logistics -- deputy director of Logistics Systems Division.

Q. So you've been promoted to the position that you used to report to?

A. Yes.

Q. And who had that position at the time?

A. Mary Rose Register.

Q. Okay. And we have talked to Mary Rose, but let's just try to flesh things out just a little bit.

So my understanding is, although you were deputy director, there were bureaus -- what were they called -- divisions that work for the director of LSD like Steve Cochran. What is that position -- branch?

A. Branches.

Q. I'm sorry. So there's four branches that work for LSD; is that correct?

A. Yes.

Q. And so you directly supervise those branch supervisors; is that correct?

A. No.

Q. All right. Do the branch supervisors then answer to the deputy

Q. But yelling in that office has occurred with many individuals. You've yelled, right? You've raised your voice?

A. Yes.

Q. What was different about this as compared to when you acted unprofessionally and raised your voice?

A. I wouldn't characterize it as unprofessional. I did raise my voice.

Q. You're saying it was professional for you to raise your voice?

A. Yes.

Q. All right. So there was a shift in behavior and tone, combative behavior, yelling, and crying that you brought up to her in an October 2018 written memorandum.

Besides the dog incident, what were the other incidents that you recall?

A. I believe the Lysol. The Lysol may have been in there. I don't know for sure.

referring to?

MR. NEAL: This is Agency file 603, page 2 of the Douglas Factors.

THE WITNESS: Both of those are true statements.

BY MR. NEAL:

Q. So I -- what did you determine, based on your experience, were the underlying factors that affected a 3.8 level employee to suddenly, a year later, go to a zero?

A. It's a trigger within the system. If you get a not met, the score comes up. So if -- I'd have to check again, but normally when you get a not met it goes to zero, then you're in that category. So one not met can...

Q. And the core competency that she did not meet is actually listed there. It said communication and teamwork and cooperation.

Exhibit T

A. I'm aware of the behavior and the experiences she had. Connecting them to a specific charge, I don't know that I could prove that they're connected.

Q. Right. Now, I guess your earlier testimony is that you didn't see documentation as to the autism?

A. No. No. At some point, I did. It was really late last year into the process. I'm not sure what date I finally received it.

Q. And how did that figure in to your evaluation, your inquiry into whether or not there was some kind of, you know, underlying cause for this change?

A. I think I answered that earlier. It didn't.

Q. You didn't consider it?

A. At that point, the work was already completed. I forget -- it was somewhere late in the year of 2019, after

Exhibit T

the proposal or after the note of admin leave, placing -- there was some point in there, but that was really late.

Q. But based on new information, you may realize that your assessment was in error, right?

A. No.

Q. You don't think the fact that she's autistic might affect her interactions with other people in the workplace?

A. I'm not a doctor. That was never part of the evaluation periods that I was a witness of.

Q. Sure, but you became aware of it. Did you try to find out if maybe you made a mistake by not considering that?

A. No. It wasn't a factor during my evaluation. She said over and over that she never had any disabilities or any reason why her behavior was changing.

Q. She did say that she has autism.

Exhibit T

# In The Matter Of:

*EYPHRA RANSOM vs.*
*DEPARTMENT OF HOMELAND SECURITY*

---

*DEPOSITION OF KEITH JOHNSON*
*February 5, 2020*

---

*COURT REPORTERS, ETCetera, INC.*
*"We'll cover your job ANYWHERE in the country!"*
*2833 Smith Avenue, #260*
*Baltimore, Maryland 21209*
*(410) 653-1115 1-800-947-DEPO (202) 628-DEPO (3376)*

*"We'll Cover Your Job ANYWHERE in the Country!"*

Original File JOHN0205.TXT
Min-U-Script® with Word Index

Exhibit U

DEPOSITION OF KEITH JOHNSON - February 5, 2020 109

them do.

Q. And the collective bargaining agreement references that if that is what the employer, the supervisor is doing is assigning duties as part of that catchall phrase that there's a limit to the percentage of time that they can assign to that without changing the position description? Does that sound familiar?

A. I'm not familiar with the exact language in the collective bargaining agreement, but I'm familiar with that process, though.

Q. And so did they raise an issue to you that Ms. Ransom did not want the change in duties to include this UAM? Does that sound familiar?

A. Yes, it does.

Q. Tell me what you know about that.

A. The supervisor was directing the employee or had directed the employee

COURT REPORTERS, ETCetera, INC.
"We'll cover your job ANYWHERE in the country!"
Exhibit U

regarding these new duties and I believe before the employee could actually engage in new duties, there was going to be some training requirement. There was going to be a requirement to meet with I think certain parties to do a formal exchange of information, review of processes, procedures, et cetera.

So the supervisor first contacted me regarding the employee's failure to do these initial things first which was to attend training, to meet with individuals that were supposed to provide her insight or guidance to these new duties and responsibilities.

Q. But it's your testimony that that was happening before a change in the position description?

A. I'm not aware whether or not if the position description was required -- if there was a requirement to change the

Exhibit U

position description. At that point, my understanding was that the duties were at a level that was aligned with the position description and would be compliant with the collective bargaining agreement.

Q. And was that something that was raised as an issue with you or how do you know that?

A. It wasn't raised as an issue with me by management. It was later raised as I think part of Ms. Ransom's grievance or part of her communication with this office.

Q. And how was that grievance resolved?

A. I believe that was one of the ones that there was no response to.

Q. Do you know why Ms. Gammon didn't respond?

MS. TILMAN: Objection, calls for speculation.

MR. NEAL: Well, the first

Exhibit U

A. The Agency has a FEMA disciplinary manual which discusses different types and examples of misconduct and what the disciplinary process is and what supervisors should be looking for and how to hold employees accountable.

Q. Can you provide that to Agency counsel?

A. Sure.

Q. Other than that manual, which I'll take a look at, is there any way of protecting the double standard supervisor from playing favorites?

A. I don't understand the question.

Q. Sure. So if I'm a supervisor and I like Grace but I don't like Eyphra, and Grace raises her voice and I say, I'm not going to worry about that, because, you know, she's somebody I like.

On the other hand, Eyphra raises her voice and I report it. I do something.

I counsel her. I do a discipline. I give her a day off. How does the Agency then may being sure that there's some kind of you know protection against that kind of double standard?

A. So LER would first question the supervisor about internal comparators. So the first question would be is whether or not if the supervisor had supervised with anyone who has engaged in similar behavior.

And so you would be expecting for the supervisor to communicate that, yes, that some employees engaged in this behavior. You're going to ask, well, what was the response and then you're going to ask for justification and then you're going to determine why there's a difference in proposed and actual implementation of corrective measures.

Q. Did you do that in this case?

A. In this case, there was a review

Exhibit U

DEPOSITION OF KEITH JOHNSON - February 5, 2020 186

of comparators, and to my understanding the supervisor had never issued discipline to another employee under their supervision.

Q. Yeah. So in this case you're understanding is that the charge of inappropriate behavior was made. Did you ask about inappropriate behavior comparatively in that particular workplace involving other employees specific to this case?

A. No, I did not ask the supervisor specifically whether or not there was other cases that the supervisor had previously communicated to me that he had never imposed disciplinary action on an employee previously.

Q. Well, and I understand that he hadn't reacted to it. Was there a question asked of him if other employees had raised their voice, used profanity, other types of inappropriate behavior in the same

COURT REPORTERS, ETCetera, INC.
"We'll cover your job ANYWHERE in the country!"

Exhibit U

workspace?

A. I don't recall.

Q. Okay.

MR. NEAL: I don't have any other questions. We pass the witness. We'll leave the deposition open. If you provide those written answers then we'll probably close that unless it just raises more issues. So I don't think it will, but we'll see when you get those done.

Anything else for the record?

MS. TILMAN: Nothing else for the record.

MR. NEAL: Off the record.

(Reading and signing reserved.)

(Deposition concluded 2:35 p.m.)

Exhibit U

**In The Matter Of:**

*EYPHRA RANSOM vs.*
*DEPARTMENT OF HOMELAND SECURITY*

---

*DEPOSITION OF GEORGIA BAIONE*
*February 4, 2020*

---

*COURT REPORTERS, ETCetera, INC.*
*"We'll cover your job ANYWHERE in the country!"*
*2833 Smith Avenue, #260*
*Baltimore, Maryland 21209*
*(410) 653-1115 1-800-947-DEPO (202) 628-DEPO (3376)*

*"We'll Cover Your Job ANYWHERE in the Country!"*

Original File BAIO0204.TXT
Min-U-Script® with Word Index

Exhibit V

besides this ID badge, would I see anything else identifying her as a service dog?

A. I don't think so. At the time, I don't think she had a vest from what I remember. She was on a leash.

Q. Okay. So describe the reaction you saw with Eyphra.

A. I didn't see the initial reaction. I heard it from a conference room.

Q. Okay.

A. And I walked out and witnessed her screaming loudly in the tone of anger that she did not like dogs and that the dog needed to get out of the area.

Q. Okay. And what did Ms. Potter do?

A. She advised it was a service dog and she -- and to put it in perspective, they were not close to each other. They were probably about -- they were several

of dogs, correct?

A. Correct. And the -- actually, the remediation to all of this was I eventually provided Eyphra's supervisor the calendar of when Rachel was going to be at headquarters. She is not based -- she was and is not based out of FEMA HQ. She's a traveling instructor for our program.

So she is not a permanent employee within the D.C. area. So Mr. Langley and I advised that I would send him a calendar of when she would be in town and that they could make appropriate accommodations so Ms. Ransom was not put in this situation again.

Q. Right. Because you understand that if Ms. Ransom was put into the situation, it could be -- she could have an emotional reaction to it based on fear?

A. Correct.

Q. Well, other than what you believe

Exhibit V

to 11:30, probably you could have just raised the issue about your children at that point?

A. I could have and I believe he asked -- I believe I did actually if I remember. And I think he told me to write and send him an email because it was one of those things I was rushing because we did talk about the situation over the weekend. He, again, advised -- we touched base real quick and I had said, hey, the girls -- I explained the relationship with Mary Rose and they like her and he said send me an email, so I did.

Q. Let's just go over a couple of incidents with you. Have you ever gotten in a shouting match with a coworker?

A. I've had to scream at coworkers. I'm not sure if there was a shouting match.

Q. You got loud?

A. I've gotten loud. I am loud. I

Exhibit V

fully admit that.

Q. You got frustrated?

A. I've gotten frustrated.

Q. Have you ever gone from your desk, gotten some Lysol, and sprayed it in the direction of Eyphra?

A. I have not.

Q. There was never an incident where you went to the supply desk or the supply room and then returned with some Lysol and sprayed it?

A. I've gone to the supply room and gotten Lysol and sprayed my own desk down.

Q. I see. And when Ms. Ransom was spraying the Lysol, was she at her own desk?

A. Yes, and the bottle was pointed up towards people.

Q. Well, if she's at her desk and you're on the other side of a file cabinet, how did she spray it at people?

A. It was a smaller file cabinet to

Exhibit V

where it went up to about our chest or the tops of our bodies were able to look over.

Q. And did you have occasions where Ms. Potter and her dog were on site that you didn't inform Ms. Ransom that he was going there, he or she? I don't know what Dori is.

A. There was one -- before we came up with the process that I had to provide a calendar, there was one incident before that that they were on the same floor, but there was no interaction. And, again, they were on the complete opposite side. And when Ms. Potter went to leave for the day, she walked around the area to where Ms. Ransom was sitting and did not come into contact with her.

Q. So the answer is yes, there were times that Ms. Potter brought her dog and you didn't --

A. Yes, there was one time. Yes,

Exhibit V

there was one time.

Q. How would you describe the way that Mr. Cochran and Ms. Ransom got along?

A. I thought they got along fine for a long time and around the same time that I started to feel uncomfortable, he had the same situations as I did and was equally uncomfortable.

Q. But he created some of those tensions as well? You'd have to agree with that, right?

A. You said I created that?

Q. I said that he, Mr. Cochran.

A. I don't know what specific instance to where Mr. Cochran did not feel comfortable with Ms. Ransom. I don't know of the exact one.

Q. But I'm saying that you knew this situation between Ms. Ransom and Mr. Cochran to be tense, right?

A. Yes, it was tense.

Exhibit V

DEPOSITION OF GEORGIA BAIONE - February 4, 2020 177

making complaints.

Q. So did management ever tell you that there were several complaints other than Mr. Cochran?

A. No, sir.

Q. In your view, did you ever exaggerate some of Eyphra's actions to make them sound more severe than they were?

A. I felt at the time I was giving an appropriate account.

Q. As you look at it now then, is it different?

A. I will be honest. I haven't read the chronology document in a while, but overall my thoughts are still the same.

Q. Did you ever get disciplined for use of profanity?

A. No. I was counseled to not do it.

Q. Did you ever have --

A. I wasn't formally.

COURT REPORTERS, ETCetera, INC.
"We'll cover your job ANYWHERE in the country!"

Exhibit V

Q. Did you ever have any discipline for unprofessional behavior?

A. No.

Q. We're getting close. I'm just reviewing my notes to make sure we're not missing anything. Have we referred to any documentation you haven't provided other than the emails?

A. No. I just looked at what you sent me.

Q. Did you ever report Eyphra to Mr. Johnson from employee relations?

A. I don't know of a Mr. Johnson.

Q. Did you ever report Eyphra to employee relations?

A. Following the --

Q. It's a yes or no.

A. I talked to someone in ELR, but I don't remember his name. I'm sorry. I did speak to somebody in ELR. I don't remember his name. I think his first name was Steve,

U.S. DISTRICT COURT
DISTRICT OF MARYLAND
FILED
2021 JUN 23 PM 1:59
CLERK'S OFFICE
AT BALTIMORE
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

District of Maryland

Northern __________ Division

| | |
|---|---|
| Eyphra Ransom<br><br>*Plaintiff(s)*<br>*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*<br><br>-v-<br><br>Alejandro Mayorkas<br>Secretary, Department of Homeland Security<br>(Federal Emergency Management Agency)<br><br>*Defendant(s)*<br>*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Case No. 21 CV 1563 JMC<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial: *(check one)* ☐ Yes ☑ No |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

**I. The Parties to This Complaint**

**A. The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Eyphra Ransom |
| Street Address | 101 W Read St. Apt. 605 |
| City and County | Baltimore, Baltimore County |
| State and Zip Code | MD 21201 |
| Telephone Number | (202)774-8103 |
| E-mail Address | ransomeyphra@yahoo.com |

**B. The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Exhibit CH

Defendant No. 1

| | |
|---|---|
| Name | Alejandro N. Mayorkas |
| Job or Title *(if known)* | Secretary, Department of Homeland Security |
| Street Address | 245 Murray Lane SW |
| City and County | Washington |
| State and Zip Code | DC 20528-0305 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | Deanne Criswell |
| Job or Title *(if known)* | Administrator, Federal Emergency Management Agency |
| Street Address | 500 C St. SW |
| City and County | Washington |
| State and Zip Code | DC 20024 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Exhibit CH

C. Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Federal Emergency Management Agency |
| Street Address | 500 C St. SW |
| City and County | Washington |
| State and Zip Code | DC 20024 |
| Telephone Number | |

## II. Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

- [√] Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

  *(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

- [ ] Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

  *(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

- [√] Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

  *(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

- [√] Other federal law *(specify the federal law)*:

  42 U.S.C. Section 1983's discrimination statute

- [ ] Relevant state law *(specify, if known)*:

- [ ] Relevant city or county law *(specify, if known)*:

Exhibit CH

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- [x] Failure to hire me.
- [x] Termination of my employment.
- [ ] Failure to promote me.
- [x] Failure to accommodate my disability.
- [ ] Unequal terms and conditions of my employment.
- [x] Retaliation.
- [ ] Other acts *(specify)*:

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)

June, 2018 through March, 2020

C. I believe that defendant(s) *(check one)*:

- [ ] is/are still committing these acts against me.
- [x] is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- [x] race
- [x] color
- [x] gender/sex
- [ ] religion
- [ ] national origin
- [ ] age *(year of birth)* *(only when asserting a claim of age discrimination.)*
- [x] disability or perceived disability *(specify disability)*

autism (Asperger's Syndrome)

E. The facts of my case are as follows. Attach additional pages if needed.

Exhibit CH

Please see attachment.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

June 19, 2019

B. The Equal Employment Opportunity Commission *(check one)*:

- [x] has not issued a Notice of Right to Sue letter.
- [ ] issued a Notice of Right to Sue letter, which I received on *(date)*

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

- [ ] 60 days or more have elapsed.
- [ ] less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Exhibit CH

Please see attachment.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 06/22/2021

Signature of Plaintiff

Printed Name of Plaintiff Eyphra Ransom

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Print Save As... Add Attachment Reset

Exhibit CH

Case 1:22-cv-02553-JMC Document 1-4 Filed 09/06/23 Page 37 of 95

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Eyphra Ransom

**(b)** County of Residence of First Listed Plaintiff Baltimore
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

**DEFENDANTS**

Alejandro Mayorkas Secretary, DHS (Federal Emergency Management Agency)

County of Residence of First Listed Defendant Washington, D.C.
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

FILED U.S. DISTRICT COURT DISTRICT OF MARYLAND 2021 JUN 23 PM 1:59 CLERK'S OFFICE AT BALTIMORE BY ___ DEPUTY

21CV1563 JMC

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☒ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1983's discrimination statute

Brief description of cause:
My former attorney submitted my EEOC appeal without a brief. Neither it nor the MSPB decision provides a response for my retaliation claim.

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ greater than $75,000

CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*: JUDGE Kasandra Robinson Styles; Carlton M. Hadden DOCKET NUMBER DC-0752-20-0145-I-1; 2021000075

DATE SIGNATURE OF ATTORNEY OF RECORD

Eyphra Ransom

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

Exhibit CJ

# Interview Questions & Applicant Assessment

## Interview Details

Position: **Assistant Program Manager**

Date: 18 Sep

Applicant Name: (b)(6)

Interviewer Name: Kevin Langley (b)(6)

## Questions / Assessment

**INTRODUCTION:** For 40 years, FEMA's mission has been to lead America to prepare for, prevent, respond to and recover from disasters with a vision of "A Nation Prepared." Our Mission Statement is:

***Helping people before, during, and after disasters***

***CORE Values:* Compassion, Fairness, Integrity, Respect**

FEMA consists of over 20,000 employees across the country at our Headquarters facilities, 10 Regional Offices, the National Emergency Training Center, Center for Domestic Preparedness/Noble Training Center, Joint Field Offices providing direct disaster support, Distribution Centers, and other locations. These employees consist of Permanent Full Time (Title V), Cadre of On-Call Response/Recovery Employees (CORE), Local Hires, and Reservists.

The position you are being interviewed for is the Assistant Program Manager working for the Director of LSD/PM of a Level II IT Acquisition Program. The Division is comprised of 42 government employees who work in four Branches (i.e., Operational Support Branch, Acquisition and Financial Support Branch, Program Management Support Branch, Information Technology Support Branch) and a Division staff section which your position resides. We have a Managed Service Provider who is the program's O&M support (Manhattan Associates) for the Logistics Supply Chain Management System (LSCMS).

This is a DHS acquisition certification covered position. Within 24 months of placement, OHS requires Level II certification in Program Management (PM). It is preferred that DHS Level III certification in PM is achieved within 48 months. The incumbent may also submit for a certification equivalency and transfer- personnel certified under the Defense Acquisition Workforce Improvement Act.

This position is located at FEMA Headquarters (500 C St SW Washington DC). There will be travel required when directed.

Exhibit CO

Page 02

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Exhibit CO

Page 03

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 04

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Exhibit CO

Page 05

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Exhibit CO

(b)(5); (b)(6)

## Interview Questions & Applicant Assessment

**Interview Details**

Position: **Assistant Program Manager**

Date: 18 Sep ;2_olc;

Applicant Name: Winston Sgerre JJ Jr

Interviewer Name: Kevin /-c,, le_

**Questions / Assessment**

**INTRODUCTION:** For 40 years, FEMA's mission has been to lead America to prepare for, prevent, respond to and recover from disasters with a vision of "A Nation Prepared." Our Mission Statement is:

***Helping people before, during, and after disasters***

***CORE Values:* Compassion, Fairness, Integrity, Respect**

FEMA consists of over 20,000 employees across the country at our Headquarters facilities, 10 Regional Offices, the National Emergency Training Center, Center for Domestic Preparedness/Noble Training Center, Joint Field Offices providing direct disaster support, Distribution Centers, and other locations. These employees consist of Permanent Full Time (Title V), Cadre of On-Call Response/Recovery Employees (CORE), Local Hires, and Reservists.

The position you are being interviewed for is the Assistant Program Manager working for the Director of LSD/PM of a Level II IT Acquisition Program. The Division is comprised of 42 government employees who work in four Branches (i.e., Operational Support Branch, Acquisition and Financial Support Branch, Program Management Support Branch, Information Technology Support Branch) and a Division staff section which your position resides. We have a Managed Service Provider who is the program's O&M support (Manhattan Associates) for the Logistics Supply Chain Management System (LSCMS).

This is a DHS acquisition certification covered position. Within 24 months of placement, OHS requires Level II certification in Program Management (PM). It is preferred that OHS Level III certification in PM is achieved within 48 months. The incumbent may also submit for a certification equivalency and transfer- personnel certified under the Defense Acquisition Workforce Improvement Act

This position is located at FEMA Headquarters (500 C St SW Washington DC). There will be travel required when directed.

Trx2

Exhibit CO

Page 07

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 08

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

7. **Describe a situation when you needed to take initiative.**
**Answer Guide:** A good answer should show off the applicant's proactivity. The situation should be a case where the candidate recognized a problem that nobody else was resolving and took initiative to attack the issue. The action should show a willingness to go above and beyond the call of duty when required. Proactivity and problem solving are rare traits that firms should be looking for; this question can go a long way toward revealing these attributes in a candidate.

(b)(5); (b)(6)

8. **Describe a mistake you've made professionally.**
**Answer Guide:** We're all human, and candidates should be able to admit that they've made mistakes at certain times. This situational question is really more about finding out how a candidate learns, reflects upon mistakes, and takes lessons learned into the future. If a candidate refuses to admit to any past mistakes, then it's a sign that he or she isn't willing or able to learn anything from difficult situations.

(b)(5); (b)(6)
(b)(6)
(b)(5); (b)(6)
(b)(6)
(b)(5); (b)(6)

9. **Interview Question:** As we still have some time left, can you tell me a story?
**Answer Guide:** Candidate should maintain his/her composure and use the question to sell his/her abilities and skills to the employer,

(b)(5); (b)(6)

Exhibit CO

**Do you have any questions for us or anything you would like to add?**

**This concludes the interview panel questions.  Human resources will reach out to you if you have been selected for this position.**

Exhibit CO

## Interview Questions & Applicant Assessment

**Interview Details**

Position: **Assistant Program Manager**

Date: /6 50p 01,

Applicant Name: (b)(6)

(b)(5); (b)(6)

Interviewer Name: Kevin Langley

**Questions / Assessment**

**INTRODUCTION:** For 40 years, FEMA's mission has been to lead America to prepare for, prevent, respond to and recover from disasters with a vision of "A Nation Prepared." Our Mission Statement is:

***Helping people before, during, and after disasters***

***CORE Values:* Compassion, Fairness, Integrity, Respect**

FEMA consists of over 20,000 employees across the country at our Headquarters facilities, 10 Regional Offices, the National Emergency Training Center, Center for Domestic Preparedness/Noble Training Center, Joint Field Offices providing direct disaster support, Distribution Centers, and other locations. These employees consist of Permanent Full Time (Title V), Cadre of On-Call Response/Recovery Employees (CORE), Local Hires, and Reservists.

The position you are being interviewed for is the Assistant Program Manager working for the Director of LSD/PM of a Level II IT Acquisition Program. The Division is comprised of 42 government employees who work in four Branches (i.e., Operational Support Branch, Acquisition and Financial Support Branch, Program Management Support Branch, Information Technology Support Branch) and a Division staff section which your position resides. We have a Managed Service Provider who is the program's O&M support (Manhattan Associates) for the Logistics Supply Chain Management System (LSCMS).

This is a DHS acquisition certification covered position. Within 24 months of placement, DHS requires Level II certification in Program Management (PM). It is preferred that DHS Level III certification in PM is achieved within 48 months. The incumbent may also submit for a certification equivalency and transfer- personnel certified under the Defense Acquisition Workforce Improvement Act.

This position is located at FEMA Headquarters (500 C St SW Washington DC). There will be travel required when directed.

C-1 f \ c ;Od.''/]

Exhibit CO

Page 12

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 13

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 14

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 15

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

# Interview Questions & Applicant Assessment

**Interview Details**

Position: **Assistant Program Manager**

Date:

Applicant Name: (b)(6)

Interviewer Name: Kevin Langley

**Questions / Assessment**

**INTRODUCTION:** For 40 years, FEMA's mission has been to lead America to prepare for, prevent, respond to and recover from disasters with a vision of "A Nation Prepared." Our Mission Statement is:

***Helping people before, during, and after disasters***

***CORE Values:* Compassion, Fairness, Integrity, Respect**

FEMA consists of over 20,000 employees across the country at our Headquarters facilities, 10 Regional Offices, the National Emergency Training Center, Center for Domestic Preparedness/Noble Training Center, Joint Field Offices providing direct disaster support, Distribution Centers, and other locations. These employees consist of Permanent Full Time (Title V), Cadre of On-Call Response/Recovery Employees (CORE}, Local Hires, and Reservists.

The position you are being interviewed for is the Assistant Program Manager working for the Director of LSD/PM of a Level 11IT Acquisition Program. The Division is comprised of 42 government employees who work in four Branches (i.e., Operational Support Branch, Acquisition and Financial Support Branch, Program Management Support Branch, Information Technology Support Branch) and a Division staff section which your position resides. We have a Managed Service Provider who is the program's O&M support (Manhattan Associates} for the Logistics Supply Chain Management System (LSCMS).

This is a OHS acquisition certification covered position. Within 24 months of placement, OHS requires Level I certification in Program Management (PM). It is preferred that OHS Level III certification in PM is achieved within 48 months. The incumbent may also submit for a certification equivalency and transfer- personnel certified under the Defense Acquisition Workforce Improvement Act.

This position is located at FEMA Headquarters (500 C St SW Washington DC). There will be travel required when directed.

Exhibit CO

Page 17

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 18

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 19

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Page 20

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

Exhibit CO

1. Ms. Potter, who bought Dori to the office without informing me after Human Resources explicitly told her to do so, was subsequently hired as a full-time member of LSD. Ms. Baione lobbied for her employment that that's one reason Ms. Register hired her. In Mrs. Baione's Chronology Document, she praises Ms. Potter multiple times because Ms. Potter did a lot of work to help her as Training Program Manager, and that's why she lobbied for her to be a full-time member of LSD.
2. Another employee, JaNina DeJesus, who also directly reports to Mr. Langley, was not satisfied with her 2018 rating and attempted to get him to change it. She is a Filipino female. Although she failed to follow Mr. Langley's instructions at least once regarding finding someone to conduct Field Call for her when she was not available, to my knowledge, he did not attempt to terminate her employment.
3. Shaunta Evans, another black female, was also placed on a PIP and, subsequently, on probation during the 2018 and 2019 timeframe. Ms. Register permitted Ms. Evans to complete a detail either while she was on probation or just before she was recommended for probation and after she had completed the PIP. Shaunta was permitted to do another detail while she was on probation, which is how she left FEMA. Natasha Hinkson, another black female, was permitted to do a rotation/detail, and so was Richard Moore. Although I was never placed on a PIP, both Ms. Register and Mr. Langley denied my requests for a detail/rotation multiple times.
4. Maxwell Domalavage is a white male. Mr. Langley replaced me in the Reporting Specialist position with him. When I was placed back on the NRCC roster, Mr. Langley placed me on nights and refused to move me to days. Mr. Langley and Ms. Register let Tye King, a white male employee who no longer worked at FEMA, stay on the NRCC roster instead of placing me back until I was placed back. Ms. Register also permitted Mr. Domalavage to complete a rotation. More recently, Ms. Register direct hired him into a logistician position that included a promotion to GS-12.
5. Chase Smith, who did some work that would have been mine for updating the Acquisition Plan after Mr. Langley removed me from all emails, is a white male.
6. The two other, more experienced people for the UAM work were Douglas Tusing and Charity Sibal, a white male and a Filipino female.

**11/27/2019 Updated Remedies**

I request the following remedial or corrective action for my EEO Complaint:
1.Ms. Register to be appropriately disciplined or otherwise investigated for intentionally providing misleading/false information to Federal Protective Service police as well as Mr. Langley, if he was involved with providing information for them to come to HQ;
2. Mr. Langley to be appropriately disciplined and potentially criminally investigated for falsifying my timesheets multiple times;
3. criminal investigation of Mrs. Baione and potentially other coworkers who may have provided false information to both Employee Relations and Mrs. Gammon during her investigations
3. unspecified damages for harassment, retaliation and any other applicable damages, repayment of funds not received due to AWOL with interest; additional damages for lost future job opportunities; backpay; money for difference in amount paid for insurance; contingency fees; emotional distress; attorney fees; etc.; will not be able to provide a detailed number until the case has been resolved since I continue to lose money daily at this time;

Exhibit CP

the Acquisition Plan, which I had worked with Chase Smith to update, Mr. Langley removed me from all emails and had Chase make at least one update that would have been my responsibility to make. When I asked why, he said I was no longer needed. When he initially said I could finish the updates, I had not yet filed the EEO Complaint, so he was under the impression that I would allow the PIP. When he removed me from all emails, I had filed the EEO Complaint and included the PIP in it. The same is true for the Sunflower Asset Management Course that is required for the custodial officer position. Mr. Langley initially said he would approve it. At that time, I had not filed the EEO complaint. Later, after I filed the EEO complaint, which included the PIP in it, he refused to have the agency cover the course. Furthermore, Mr. Langley directed me to develop a property disposal plan. I provided him a copy of the plan FEMA has already developed. Work relating to property has traditionally been the Accountable Property Officer's responsibility. It is not one of my objectives. Mr. Langley included it as part of the work for updating the ILSP, but developing a disposal plan is completely separate from updating the ILSP. After I made Mr. Langley aware that FEMA already had a disposal plan, he directed me to review it, specifically for how batteries are disposed. This work is "other duties as assigned" in my Position Description, which was already well above the 20% that my Position Description permits. This does not include the custodial officer work that he also directed me to do. Per Mr. Langley's instruction, well over 50% of my work would have been "other duties as assigned." At no point did Mr. Langley update my Position Description for the work outside of it that he directed me to do.

**Mrs. Baione Monitoring Me:** Mr. Langley and/or Ms. Register directed Mrs. Baione, to monitor and document my behaviors and actions at work since August 2018. In response to her *Chronology Document*, I updated it and developed my *Chronology Document Response*, which I submitted with my *Removal Proposal Response Memorandum*. My *Chronology Document Response* includes not only all of the information from Mrs. Baione's *Chronology Document*, several notable events that my coworker failed to include in her *Chronology Document*, including the fact that I reported her for profanity at work during last year's May 29-June 1, 2018 offsite before Mr. Langley ever asked her to monitor and document my behavior and actions at work. Moreover, for Mr. Langley and/or Ms. Register to have Mrs. Baione documenting me without my knowledge and to include her documentation in Mr. Langley's *Removal Proposal* is a violation of my privacy. Mrs. Baione is not a supervisor. She has never been my supervisor or in my chain of command; therefore, she should not have had any direct input into Mr. Langley's *Removal Proposal* to get me terminated.

**Notes**

1. Ms. Potter, who bought Dori to the office without informing me after Human Resources explicitly told her to do so, was subsequently hired as a full-time member of LSD. Ms. Baione lobbied for her employment that that's one reason Ms. Register hired her. In Mrs. Baione's Chronology Document, she praises Ms. Potter multiple times because Ms. Potter did a lot of work to help her as Training Program Manager, and that's why she lobbied for her to be a full-time member of LSD.
2. Another employee, JaNina DeJesus, who also directly reports to Mr. Langley, was not satisfied with her 2018 rating and attempted to get him to change it. She is a Filipino female. Although she failed to follow Mr. Langley's instructions at least once regarding finding someone to conduct Field Call for her when she was not available, to my knowledge, he did not attempt to terminate her employment.

Exhibit CP

IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
MARYLAND

EYPHRA RANSOM, *
*
Plaintiff, *
*
v. * Civ. Action No. 22-CV-GLR-22-2355
*
ALEJANDRO MAYORKAS, Secretary, *
Department of Homeland Security, *et al.*, *
*
Defendants. *
***

**MOTION TO AMEND PLEADING**

I, Plaintiff, Eyphra Ransom, pursuant to Fed. R. Civ. P. Rule 15(a)(2), move to amend my pleading. The grounds and authorities for this Motion are set forth in the accompanying Memorandum of Law, which is incorporated herein by reference. I have also included the amended pleading.

WHEREFORE, Plaintiff respectfully requests that the Court grant my *Motion to Amend Pleading* and accept my amended pleading.

Respectfully submitted,

By: [signature]
Eyphra Ransom
Plaintiff
101 W Read St. Apt. 605
Baltimore, Maryland 21201
(202)774-8103
ransomeyphra@yahoo.com

Exhibit CQ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EYPHRA RANSOM, *
*
Plaintiff, *
*
v. * Civ. Action No. 22-CV-GLR-22-2355
*
ALEJANDRO MAYORKAS, Secretary, *
Department of Homeland Security, *et al.*, *
*
Defendants. *
***

**MEMORANDUM OF LAW IN**
**SUPPORT OF MOTION TO AMEND PLEADING**

This is an employment discrimination case. I allege that I was discriminated against based on her race, gender/sex, and disability, and retaliated against for her protected activity (filing multiple grievances and a formal complaint of discrimination) when the Federal Emergency Management Agency (FEMA) wrongfully terminated my employment.

This amended pleading should be accepted for several reasons. Leave to amend pleadings under Fed. Civ. R. P. Rule 15(a) should be freely given in the absence of any apparent or declared reason, such as undue delay, bath faith, or dilatory motive on the movant's part, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## I. RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

I previously worked at FEMA Headquarters (HQ) in Washington, DC as a Logistics Management Specialist. (ECF No. 23, April 11, 2023 Updated Statement of Facts at 1) I received notice of my proposed removal on August 21, 2019. (Exhibit A: Removal Proposal) The reasons for my proposed removal were failure to follow instructions, absence without leave, lack of candor, and

Exhibit CR

inappropriate behavior. (Exhibit A: Removal Proposal, pp. 1-4) On October 16, 2019, I received Agency's decision to remove me from federal serve effective October 17, 2019 with a Mutual Separation and General Release Agreement. (Exhibit B: Mutual Separation and General Release) Carla Gammon, a white female and the Deciding Official for my termination as Mr. Langley's supervisor, signed the Mutual Separation and General Release Agreement on behalf of the Agency. The Mutual Separation and General Release gave me 24 hours to withdraw HS-FEMA-01522-2019 and agree not to work for the Department of Homeland Security (DHS) for three years in exchange for being allowed to resign. (Exhibit B: Mutual Separation and General Release) The Mutual Separation and General Release Agreement did not address my security clearance for future federal employment or my SF-50. I did not sign it. (Exhibit C: Oct 17, 2019 Mutual Separation and General Release Response)

As I documented in my 2018 Rating of Record Grievance to Mrs. Gammon, I filed the 2018 Rating of Record Grievance on March 25, 2019. (Exhibit D: Step 3 Grievance) I updated it on April 9, 2019. (Exhibit E: Step 3 Updated Grievance) In addition to the grievance itself, I submitted attachments with it. (Exhibit F: Step 3 Grievance Email); (Exhibit G: Second Quarter Comments Aug 2018); (Exhibit H: Third Quarter Comments Aug 2018) On April 8, 2019, I updated its remedies. (Exhibit I: Step 2 2018 Rating of Record Update Email) I also addressed the 2018 Rating of Record Grievance in the Position Description Grievance. (Exhibit AJ: Position Description Grievance, Agency File pp. 459-460)

I received Mrs. Gammon's response for the 2018 Rating of Record Grievance on April 18, 2019. (Exhibit K: Step 2 Grievance Response) In her response, Mrs. Gammon wrote:

> During the rating period, you were involved in several communication misunderstandings and communication breakdowns in the workplace related to ineffective listening skills and providing inappropriate responses while communicating with others. These communications were so egregious and caused disruption that such behavior overshadowed your positive interactions. In addition, your immediate supervisor has documented within your performance plan your continued behavior of raising your voice and becoming unprofessional in your interactions with your

supervisor.

(Exhibit K: Step 2 Grievance Response, pp. 1)

Without Mrs. Gammon providing specific supporting documentation, I will not address her personal opinion that's not factually supported.

Mrs. Gammon specifically relied on the Grammarly workplace issue and wrote that did not follow Mr. Langley's instruction to provide confirmation from IT and that I followed Mr. Langley into the hall and yelled after he denied my request. (Exhibit K: Step 2 Grievance Response) What Mrs. Gammon doesn't include is that I told Mr. Langley, a white male and my former first-line supervisor, that the Office of the Chief Information Officer (OCIO) wanted to see my supervisor's permission, which is why I asked him if I could get Grammarly [installed]. It was the same procedure for how I got Microsoft Project installed. In response to Mr. Langley's direction to obtain a list of approved software, I told him OCIO just wanted to see something with my supervisor's approval and that, even if there is a list of approved software, that doesn't mean it's updated. I said Grammarly could be approved and not be on the list. I didn't request the list of approved software after I decided it wasn't worth pursuing. Once it was so difficult to discuss it with Mr. Langley, I dropped the idea completely. It appeared that Mr. Langley was attempting to provoke me so that he could write me up. He knew OCIO's procedure for requesting software because I had to get an email with his approval to get [Microsoft] Project installed. Mr. Langley routinely approved for other coworkers to get software installed just by providing an email authorization, not requesting a list of approved software from OCIO. (Exhibit L: HS-FEMA-01522-2019); (Agency File pp. 59-60) While Mrs. Gammon mentions that she received other periodic complaints and concerns from Logistics Management Directorate (LMD) staff regarding my communications during the rating year, she did not identify them.

Mrs. Gammon went on to write that I "did not work constructively with others to reach

mutually acceptable agreements to resolve conflicts" and that I did not effectively handle disagreements and conflicts appropriately during the rating period." Mrs. Gammon also stated that I "continued to have conflicts with your immediate supervisor, Kevin Langley where you engaged in disrespectful behavior. This also occurred in your interactions with your second level supervisor." Without Mrs. Gammon providing specific supporting documentation, I will not address her personal opinion that's not factually supported.

Then, Mrs. Gammon addressed my reaction to Dori's presence at HQ. On 2 Oct 2016 I made leadership aware of my fear of dogs on my first day at FEMA HQ. I noted there was no more space at the end and printed my response in its entirety on attachment. (Exhibit M: Agency Production of Documents, pp. 3532); (Exhibit G: Second Quarter Comments Aug 2018). "... When initially Rachel brought Dori [her dog] to the floor on 8 June, she was already well aware of who I was and that I am afraid of animals." (Exhibit G: Second Quarter Comments Aug 2018) Here's what Mrs. Baione, a white female who Mr. Langley later promoted to supervisor, originally reported to Mr. Langley and Ms. Register, a white female and my former second-line supervisor, about the Dori workplace issue. (Exhibit N: ROI 327-328) On August 7, 2018, I informed Mr. Langley of Mrs. Baione's lack of candor in her complaint about Rachel's dog, Dori. I requested to have my complaint included in her second quarter comments just as details of her complaint were included in mine. I told him what was inaccurate at a meeting that same day and he still refused to correct it, even after I wrote him as directed. (Exhibit O: Agency Production of Documents, pp. 3534); (Exhibit P: Agency Production of Documents, pp. 3541-3542)

In Mrs. Baione's response to the Equal Employment Opportunity (EEO) investigator, she wrote that the dog was by Ms. Potter's side at the time. Mrs. Baione admitted that Ms. Potter, a white female non-supervisory employee, was supposed to tell her when she would be in the office so she could advise Mr. Langley and Mr. Cochran, a white male and her supervisor at the time. (Exhibit Q:

ROI 14) In her Chronology Document that was included with Mr. Langley's Removal Proposal, Mrs. Baione again wrote that Rachel's service dog was sitting by Rachel's side. "During this outburst, Dori did not move from Rachel's side and made no attempt to approach Eyphra or anyone else at the time." (Exhibit R: ROI 321) In both Mrs. Baione's email to Mr. Langley and Ms. Register and in her Chronology Document, she stated that Ms. Potter spoke to me and even placed what she alleges Ms. Potter said in quotes. (Exhibit Q: ROI 14); (Exhibit R: ROI 321)

I told Mrs. Gammon during my interview with her about this event that Rachel did not say anything to me. I told her I brought it up at Mr. Langley's crawfish broil since Mr. Langley was not present at work when it happened. It was then that Mrs. Baione said it was a service dog and I said it was still a dog. Ms. Potter did not attend the party, and her dog was not there. (Exhibit S: Carla Gammon's MR Grievance Interview Notes, pp. 30-31 of 79) It was not until my former attorney, Mr. Randolph Neal, questioned Mrs. Baione during deposition testimony that Mrs. Baione admitted that she was in a conference room when this occurred. (Exhibit T:  Georgia Baione February 4, 2020 Deposition Testimony, pp. 39, lines 6-10) Mrs. Baione admitted that in that situation I could have an emotional reaction out of fear. (Exhibit T: Georgia Baione February 4, 2020 Deposition Testimony, pp. 51, lines 16-20) According to the Prehearing Submission, it was Mrs. Baione who spoke on June 8, 2018 and said "it's a service dog." Starting on June 11, 2018 Ms. Potter was to notify me in advance if she would bring Dori to the floor. (Exhibit U: Prehearing Submission, pp. 12 of 80) Mrs. Baione admitted that at least once she did not inform me that Dori would be at work, as she was required to do. (Exhibit T: Georgia Baione February 4, 2020 Deposition Testimony, pp. 174, lines 3-21- pp. 175, line 1) In this instance, Mrs. Baione clearly failed to follow instructions. The Prehearing Submission also states that "Mrs. Baione attributed her comments regarding Dori at Mrs. Langley's crawfish boil to Ms. Potter, who said nothing to me and did not attend the crawfish boil." (Exhibit U: Prehearing Submission, pp. 12 of 80)

Finally, Mrs. Gammon mentions the Lysol workplace issue. Although the Lysol workplace issue occurred on July 15, 2018, Mr. Langley waited until the third quarter to include it in my performance review. Employees provided conflicting accounts of this workplace issue. Mr. Langley wrote that "On 12 October 2018, you received a written counseling regarding a succession of incidents of recent inappropriate conduct and behavior in the workplace, which included the spraying of Lysol in the direction and close proximity of a fellow employee on 15 July." (Exhibit V: ROI 208-209) When asked about it by the EEO investigator, Mr. Langley wrote "Eyphra sprayed Lysol in front of and in close proximity to Steve Cochran, Supervisory Program Manager, Logistics Systems Division. Steve coughed then Eyphra stood up and pointed the Lysol can in Steve's direction and laid out a 5 to 10 second spray." (Exhibit W: ROI 195) Mr. Langley was not present for this. What Shanta Evans, the black female non-supervisory employee who reported this workplace issue to Mr. Langley, actually told him was that "Eyphra just sprayed a Lysol in front of Steve Cochran's face. We can smell it all the way over here. … Rebecca and I were talking and all of a sudden Eyphra got up from her chair and sprayed a lot of Lysol in front of his desk…" When Ms. Evans responded to the EEO investigator under oath, she wrote "She was talking to one of her coworkers, Rebecca (no longer with FEMA) when she noticed complainant stood up and sprayed Lysol on the front of her monitor. Complainant was a few inches behind Mr. Cochran when she sprayed Lysol. The way she sprayed the Lysol was inappropriate." (Exhibit X: ROI 18)

When Steven Cochran, the white male branch chief who Mr. Langley accused me of spraying Lysol "in front of and in close proximity to," reported to Mr. Langley was that "Your employee literally just dosed the whole area with Lysol after I coughed over here. Stood up point the can in my direction and laid out a 5-10 second spray in my direction. Ask Shaunta, Rebecca, and Georgia. Like I was a cockroach." (Exhibit W: ROI 195) When Mr. Cochran responded to the EEO investigator under oath, he wrote that "he was the employee Complainant sprayed in the face with Lysol. He was

sitting at his desk which was across from Complainant. He said he either sneezed or coughed and she reached for the Lysol can and sprayed it over the partition and sprayed it right in his face. … He said to her "' Excuse me.' " She said " ' I don't want to get any germs.' " (Exhibit X: ROI 18-19) Ms. Register wrote the EEO investigator under oath that "Complainant said the day before that Mr. Cochran was coughing and she was disinfecting the area. Mr. Langley investigated and got several accounts of the incident. Complainant alleged that she was not spraying Lysol at Mr. Cochran but in the work area to disinfect since he was coughing the day before. Ms. Register had no reason not to believe Complainant. However, it was a dangerous action and could have harmed someone." (Exhibit X: ROI 18)

When Mrs. Baione responded to the EEO investigator under oath, she wrote "… Mr. Cochran coughed and Complainant sprayed Lysol right at him. … They didn't even have half a wall between them. Mr. Cochran and Complainant were within a couple of feet of each other when she sprayed the Lysol." (Exhibit X: ROI 19) During deposition testimony, also under oath, when asked if I [Eyphra Ransom] sprayed Lysol at my own desk, Mrs. Baione stated "Yes, and the bottle was pointed up towards people." When asked how I sprayed it at people if she was on the other side of the file cabinet, she responded "It was a smaller file cabinet to where it went up to about our chests or the tops of our bodies and we were able to look over." (Exhibit T: Georgia Baione February 4, 2020 Deposition Testimony, pp. 173, lines 4-21 – pp. 174, lines 1-2)

According to the Prehearing Submission, "I sprayed Lysol in my area from my desk to kill the germs so I wouldn't catch his germs. I never left my seat." The Prehearing Submission goes on to describe Mrs. Georgia Baione previously spraying Lysol in close proximity to me. (Exhibit U: Prehearing Submission, pp. 14 of 80)

Although Mrs. Baione admitted workplace issues including multiple uses of profanity and yelling at work, she was never formally disciplined for use of profanity at work and never received

any discipline for unprofessional behavior. (Exhibit T: Georgia Baione February 4, 2020 Deposition Testimony, pp. 172, lines 15-21- pp. 173, lines 1-3; pp. 177, lines 16-21 – pp. 178, lines 1-3) According to Keith Johnson's deposition testimony, he did not recall if other employees had raised their voice, used profanity, or other types of inappropriate behavior in the same workspace. (Exhibit Y: Keith Johnson February 5, 2020 Deposition Testimony, pp. 184-187) When asked about his own yelling at work, Mr. Langley admitted he had raised his voice, but that it was not unprofessional. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 102)

Mrs. Gammon admitted under oath to the EEO investigator that I included Mr. Langley not meeting with me for my third quarter 2018 performance review in a March 25, 2019 grievance to her. She wrote that she reviewed the grievance documents, conducted interviews, and prepared a report. According to Mrs. Gammon's deposition testimony, she was notified by the Office of Professional Responsibility (OPR) or EEO to investigate Mr. Langley for this allegation. According to Mrs. Gammon's Step 3 Grievance response, the allegations of misconduct in my 2018 Rating of Reference grievance were forwarded to the Administrative Investigations Directive Committee and OPR for review. (Exhibit K: Step 2 Grievance Response, pp. 2) Mrs. Gammon during deposition testimony stated that she interviewed everyone mentioned in the case and made a determination that Mr. Langley had not committed any type of actions that would warrant discipline. (Exhibit AA: Carla Gammon March 11, 2020 Deposition Testimony, pp. 168, lines 20-21 – pp. 170, lines 1-2). However, according to *FEMA Directive: Office of Professional Responsibility*, *FEMA Directive #112-13*, duty-related matters *are* misconduct. It lists the following examples -- tardiness, attendance issues, travel card delinquencies, etc. With the exception of allegations against senior management officials or GS-15 personnel, these types of misconduct are generally best addressed by supervisors and managers in coordination with the FEMA Office of the Chief Component Human Capital Officer Labor and Employee Relations Office. Other reportable allegations include abuse of authority and gross

mismanagement. (Exhibit AB: *FEMA Directive #112-13*, pp. 2)

On April 25, 2019 I filed Step 3 of the 2018 Rating of Record Grievance to Jeffrey Dorko, a white male and Mrs. Gammons's supervisor. (Exhibit D: Step 3 Grievance); (Exhibit AC: Step 3 Grievance Attachments) I received his response on June 5, 2019. (Exhibit AD: Step 3 Grievance Response) Mr. Jeffrey Dorko's response mirrored Mrs. Gammons's word for word regarding his unsupported opinions on communication and teamwork and cooperation core competencies. (Exhibit AD: Step 3 Grievance Response, pp. 3-4) Without Mr. Dorko providing specific supporting documentation, I will not address his personal opinion that's not factually supported. Mr. Dorko even mentioned the Lysol workplace issue word for word as Mrs. Gammon did. Please see my previous response when I discussed it regarding the third quarter of 2018. Although Mr. Dorko's Step 3 2018 Rating of Record response stated that Mr. Langley "publicly berated me and on a separate occasion he directed profanity towards you," and that this was being investigated separately and apart from the grievance process, no one contacted me about this investigation or informed me of its results.

I filed the Condition of Employment Grievance on April 9, 2019. (Exhibit AE: Condition of Employment Grievance) The Condition of Employment Grievance is also known as the MR Grievance. (Exhibit AF: MR Grievance); (Exhibit AG: MR Grievance Attachments) I updated the Condition of Employment Grievance and provided more supporting documentation on April 10, 2019. (Exhibit AH: Updated MR Grievance); (Exhibit AK: Updated MR Grievance Attachments) I cannot locate a response from the Agency for the Condition of Employment Grievance in the record.

I filed the Position Description Grievance sometime before April 19, 2019, when I updated it. (Exhibit AI: Receipt of Updated Position Description Grievance) I updated again it on April 25, 2019. (Exhibit AJ: Position Description Grievance) The Position Description Grievance discussed my 2019 goals and objectives in relation to my Position Description. In it, I specifically focused on the user account manager (UAM) work. (Exhibit J: Position Description) While I cannot locate the

Agency's response, it did provide one. According to the Prehearing Submission, "The Agency's response was that I had not done the work to verify the level of effort." (Exhibit U: Prehearing Submission, pp. 53 of 80) Please see where Mr. Langley, Ms. Register, and Mrs. Gammon still ordered me to continue doing the UAM work as the primary UAM even after I qualified it and proved that it violated the Union Collective Bargaining Agreement and my Position Description in the 2019 Performance Review and Appraisal section. (Exhibit AY: Agreement on UAM Work); (Exhibit AZ: Qualification of UAM Work)

It appears as if I filed the AWOL Grievance on April 26, 2019. Instead of relying on the traditional memo format, I developed two timelines as the basis of the AWOL grievance. (Exhibit AL: Illness Timeline); (Exhibit AM: System Admin Course Timeline) I also included other supporting email documentation. (Exhibit AN: AWOL Grievance Attachments); (Exhibit AO: AWOL Grievance Indefinite Telework Supporting Documentation) The Agency did not provide a response for it.

Mr. Langley followed the same pattern of including negative comments in my performance reviews in 2019 without verifying to see if they were true or providing me an opportunity to respond. For 2019, Mr. Langley assigned me goals of annually updating the Integrated Logistics Support Plan (ILSP); managing Logistics Systems Division's hardware in operational support of the Logistics Supply Chain Management System; and the primary UAM role in support of the A-123 audit from DHS. (Exhibit AP: 2019 Performance Review and Appraisal, pp. 2615-2620) In an April 2, 2019 email to Mrs. Gammon about my 2019 first quarter objectives, I wrote that I was doing work at the time that wasn't covered in my 2019 objectives, that Mr. Langley was aware of it and directed me to continue doing it. One objective was assigned to me despite two other people already doing the work. For the third objective, I had already completed a similar document that Mr. Langley approved, so I was not sure if assigning it was double work for me. Mr. Langley insisted I use Project to complete

it but wouldn't answer when I asked if it was a project. Mr. Langley had never previously required me to use Project. Mr. Langley instructed me to use Project for it after it was about 85% done. (Exhibit AQ: 2019 First Quarter Objectives Email) On April 12, 2019, I commented that objectives were narrowly tailored and do not permit all accomplishments to be accepted. I had no input on the objectieve, they were not smart – specific, measureable, achievable, realistic, timebound, and, at that time, there were no excellence goals. I stated at that time that at least one objective had been improperly assigned based on my Position Description and the Collective Bargaining Agreement. (Exhibit AP: 2019 Performance Review and Appraisal, pp. 2615-2616)

Mr. Langley started by stating that he asked all employees via email to provide a draft of their 2019 performance goals by 22 Feb 2019 that we would refine. He went on to write, without providing any supporting documentation, that I did not provide any input and only stated that I had nothing to do. (Exhibit AP: 2019 Performance Review and Appraisal, pp. 2626-2627) Without Mr. Langley providing specific supporting documentation, I will not address his personal opinion that's not factually supported.

A series of emails starting February 25, 2019 address my first quarter 2019 objectives. I wrote that upon return from furlough, I immediately attempted to complete the update of the ILSP, which Mr. Langley directed me to place on hold even though I'd already updated the Comments Resolution Matrix. I wrote that I couldn't agree to a meeting to brief Mr. Langley and Ms. Register about the new warehouse scan device numbers because there is conflicting information about the numbers, which I'd already told him. I wrote that the only work I had at that time was training. (Exhibit AQ: 2019 First Quarter Objectives Emails) That is the statement Mr. Langley took out of context by claiming that I stated that I have nothing to do in writing for my 2019 first-quarter performance review.

I requested a detail or rotation and that Mr. Langley had denied my request multiple times,

often with no reason for me requesting a detail or rotation was stated. (Exhibit U: Prehearing Submission, pp. 31 of 80) I never told Mr. Langley or anyone else why I requested a detail or rotation, nor did he or anyone else ask. Mr. Langley went on to write that he told me he would note my inability to receive directions and respond appropriately to decisions. Mr. Langley wrote that I requested a detail verbally many times in 2018 and then again on 28 January 2019. At the time I requested details, I had no negative rating and was eligible by all applicable standards to be approved by my supervisor. Ms. Register also would not approve a detail for me; however, she approved details for Natasha Hinkson, Shaunta Evans and Richard Moore, and a rotation for Maxwell Domalavage black females, a black male, and a white male respectively. (Exhibit AR: HS-FEMA-01522-2019 Nov 27 2019 Update, Agency File pp. 100) According to Ms. Register's response to the EEO investigator, unlike me, none of them filed a grievance or EEO complaint regarding her that went to completion. (Exhibit AS: ROI 488, ¶ 29)

Mr. Langley noted that I requested a detail on January 28, 2019 and then again on January 30, I sent another email asking him to respond. Mr. Langley wrote that he told me no verbally on January 28, 2019 and that I asked him again that morning via email and he didn't respond because he had already answered my question. Without Mr. Langley providing specific supporting documentation, I will not address his personal opinion that's not factually supported.

What Mr. Langley failed to include in my 2019 first quarter performance review was that he told me on January 28, 2019 that I could not go on a detail then (at that time). He ignored me when I asked when (I could go). I found a specific detail and asked to go on it. Previously, I did not request to go on a specific detail, just permission to see if I could do a detail. On January 30, 2019 I requested to go on a specific detail with a deadline. (Exhibit AT: Request for a Detail Emails) Mr. Langley said I could not go on a detail then, meaning I could go on one later, because it's how he and Ms. Register handled employees after they placed them on a Performance Improvement Plan (PIP). To my

knowledge, Shaunta Evans was placed on a PIP after she received a Written Counseling, and only then did Ms. Register approve a detail for her. (Exhibit AU: Shaunta Evans Written Counseling) This permitted Shaunta to report to a different supervisor during the evaluation period for her PIP so she would have a better chance of not being fired. Mr. Langley's answer here, which he did not deny, indicates he was already planning to place me on a PIP at that time. By March 28, 2019, Mr. Langley had already begun writing the PIP and was following up with Mr. Keith Johnson, a black male and Employee Relations Specialist, to ensure it began at a reasonable time. (Exhibit AV: Agency Production of Documents, pp. 3872) Mr. Langley then claimed that I requested a detail from both Ms. Register and Mrs. Gammon after he said no. Without Mr. Langley providing specific supporting documentation, I will not address his personal opinion that's not factually supported.

Regarding canceling my telework agreement, Mr. Langley claimed I pushed back on being required to come in on my telework day to brief him and Ms. Register about the spares analysis on February 27, 2019. That's not true. I wrote him on February 26, 2019 that Jason Southerland, a white male who led the scan devices project for which the spares were an issue, and I were trying to get an accurate number for the spares. I told him the distribution centers were not aware that some of the devices may be spares and that I still had training to complete. Mr. Langley insisted he would reevaluate his decision regarding my telework after we established 2019 goals. (Exhibit AW: Spares and Telework Discussion) Mr. Langley never had any further discussion of his decision to cancel my telework with me.

According to the Prehearing Submission, Mr. Langley lied and said he did not know what work I was supposed to be doing. This was after he told me that submitting a weekly schedule to him is required for mandatory telework. On February 25, 2019 Mr. Langley verbally told me he cancelled my telework agreement because I told him I did not have substantive work to do. I went on to say how I had begun updating the ILSP upon return from the partial shutdown before he directed me to

place it on hold. I wrote that I couldn't brief him and Ms. Register about the new warehouse scan devices because of conflicting information about the numbers, something I had already told them. That left training as the only work I had at the time because Mr. Langley had not provided me any objectives. I asked why he was penalizing me by canceling my Telework Agreement when he had not assigned me anything I could accomplish at the time. (Exhibit U: Prehearing Submission, pp. 22-23 of 80)

Mr. Langley next said I failed to comply with his directions on 6 March when I refused to accept a new task/role (i.e., user account manager). Mr. Langley wrote that my refusal to accept this task directly led to me being coded as AWOL during the first quarter. I never refused to accept the UAM work as Mr. Langley states. Despite the work being a violation of the Union Collective Bargaining Agreement and my Position Description, I did it. (Exhibit J: Position Description); (Exhibit AX: *Union Collective Bargaining Agreement*, Agency File pp. 501) Even after I qualified the UAM work and proved that it violated my Position Description and the Union Collective Bargaining Agreement, Mr. Langley, Ms. Register, and Mrs. Gammon all insisted I continue to do it as the primary UAM. (Exhibit AY: Agreement on UAM Work); (Exhibit AZ: Qualification of UAM Work)

This did not include the accountable property work that Mr. Langley assigned me as an objective, which was also not in my Position Description. The property responsibility had only previously been assigned to GS-11 administrative employees. Never in the history of LMD had it been assigned to a GS-13 logistician. Even had I been an alternate UAM, I could've continued to do the work without violating my Position Description and the Union Collective Bargaining Agreement, but Mr. Langley, Ms. Register, and Mrs. Gammon insisted that I not only continue to do the UAM work in violation of my Position Description and the Union Collective Bargaining Agreement, but that I must be the *primary* UAM. As early as April 5, 2019, Ms. Register, and Mrs. Gammon were

all aware that the UAM work violated my Position Description and the Collective Bargaining Agreement. (Exhibit BA: UAM CBA Email) When asked about it during MSPB testimony, Mrs. Gammon responded that "I believe that any initial new assignment that there – a learning curve takes time, and I believe that temporarily this could have exceeded the 20 percent, but over a year's time which have typical performance appraisal is what, is 12 months, then it would – it could have been under the 20 percent." When my former attorney asked Mrs. Gammon to identify the basis for that conclusion, she responded "My supervisory experience is not in the proposal package." (Exhibit AA: Carla Gammon MSPB Testimony, pp. 284-288)

I informed Mr. Langley on April 1, 2019 that as other duties as assigned, the UAM work couldn't be over 20% of my work as per my Position Description and he had already weighed it 30%, plus that was only likely to increase as the disaster season approached the during the disaster season. Instead of responding to me, Mr. Langley forwarded the email to Mr. Johnson and wrote that it was so unproductive; "only a sample as she does this or picks apart how she has no work." (Exhibit BB: Agency Production of Documents, pp. 3588)

On January 31, 2019, Mr. Langley wrote an email to himself to read labor union appeals. (Exhibit BC: Kevin Langley Grievance Email) I only submitted my 2018 Initial Request to Resolve Concerns directly to Mr. Langley. After it, I submitted all grievances directly to Mrs. Gammon. Mr. Johnson also received copies of grievances from Mrs. Gammon in his position as Employee Relations Specialist. Either Mrs. Gammon or Mr. Johnson sent Mr. Langley copies of grievances after I submitted them. The other person who received it and could've done it was Robyne Jackson, a white female and Mr. Johnson's supervisor in Employee Relations. Regardless of who sent it to him, Mr. Langley received a copy of the Position Description Grievance and the other grievances, so he knew the UAM work violated the collective bargaining agreement. When asked about it during deposition testimony, Mr. Langley responded that he did not recall me mentioning the

collective bargain agreement. He said that I only expressed concern about the 20%. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 114) Mr. Johnson was also aware because he wrote the grievance responses for Mrs. Gammon and Mr. Dorko. Mr. Johnson received all grievances and helped management answer them. Mr. Johnson claimed during deposition testimony that when Mr. Langley contacted him about the UAM work, his "understanding was that the duties were at a level that was aligned with the position description and would be compliant with the collective bargaining agreement." (Exhibit Y: Keith Johnson February 5, 2020 Deposition Testimony, pp. 109-111)

Mr. Langley wrote that I do not deal with everyone in a professional manner (e.g., Director and him), and I do not effectively handle conflict in a constructive manner. Mr. Langley went on to add that I challenge most of his directions and quickly escalate to my second-line supervisor and then up the chain of command. Mr. Langley wrote that I was not meeting communication expectations. Mr. Langley wrote that I do not apply effective listening skills and do not appropriately respond when communicating with him and others. Mr. Langley wrote that I do not show respect for leadership, that he had seen no improvement from last year's performance and in fact [that] my behavior was less cooperative and more combative. Without Mr. Langley providing specific supporting documentation, I will not address his personal opinion that's not factually supported.

My second quarter 2019 goals were even worse, to the point where I had to elevate to Mrs. Gammon because Mr. Langley dragged his feet on completing them. By then I refused to meet with him alone and he could not force me to do so. As a result, Ms. Register was present for each meeting with him. (Exhibit BD: Request for a Witness to Discuss 2018 Performance Evaluation); (Exhibit BE: April 5, 2019 Future Meetings Email) I mentioned that Ms. Register was not a neutral third party. (Exhibit BF: Agency Production of Documents, pp. 3232)

Mr. Langley included negative comments for the diminishing manufacturing sources and

material shortages work that were not true. Had he spoken to me, I could have told him that the information for which he documented me was not accessible to me; however, he included the negative comments without speaking to me [to verify if they were true]. It appears that he did not check to see if the information was accessible to me. (Exhibit U: Prehearing Submission, pp. 73 of 80)

When Mr. Langley did update my objectives, he regularly, and I think intentionally, updated them right before meetings without informing me to take me by surprise. My responses are in red here. (Exhibit BG: Agency Production of Documents, pp. 2238-2241) I expressed concerns in multiple emails. (Exhibit BH: Agency Production of Documents, pp. 3684-3685) On April 1, 2019, I wrote "these objectives make no sense to me" in an email to Ms. Register on which Mr. Langley was cc'd. (Exhibit BI: Agency Production of Documents, pp. 3692) My objectives not being complete, I was confused about what my exact duties were. I provided additional information about my 2019 objectives. (Exhibit AR: HS-FEMA-01522-2019 Nov 27 2019 Updated EEO Complaint) For example, Mr. Langley never listed what projects I was supporting in 2019. Ms. Register initially refused to meet with Mr. Langley and me as the third party even after I informed them both that Alternative Dispute Resolution would no longer be involved. Starting with our April 22, 2019 meeting, Mr. Langley sent multiple attachments less than 30 minutes before the meeting started, not allowing me time to review and prepare for the meeting. (Exhibit AR: HS-FEMA-01522-2019 Nov 27 2019 Updated EEO Complaint, pp. 20-21)

On June 24, 2019, FEMA received HS-FEMA-01522-2019, the first formal discrimination complaint on the bases of race, gender, and retaliation. (Exhibit L: HS-FEMA-01522-2019); (Exhibit BJ: HS-FEMA-01522-2019 Postage Envelope) I subsequently updated it twice. (Exhibit AR: HS-FEMA-01522-2019 Nov 27 2019 Update); (Exhibit BK: HS-FEMA-01522-2019 Dec 2 2019 Update) Importantly, the Agency excluded multiple letters from Mr. Neal in the Report of

Investigation. (Exhibit BL: April 14, 2020 Neal Letter); (Exhibit BM: July 8, 2020 Neal Email and Letter) In the July 8, 2020 Neal Email and Letter, Mr. Neal wrote that he had lost all confidence in the investigator and requested that the Agency assign a new investigator. (July 8, 2020 Neal Email and Letter, pp. 3) Mr. Neal requested "that a new investigator be assigned who at a minimum has appropriate training and experience to be sensitive to and effectively interact with my autistic client and objectively work with her to ensure her side of the story is heard." (Exhibit BM: July 8, 2020 Neal Email and Letter, pp. 3) Mr. Neal went on to write that "While the Agency has missed every deadline in its initial handling of this case, the contract investigator is now placing unreasonable time restraints on my client, along with constant threats that she will be considered "' non-compliant.' " All this while my client was concurrently preparing and participating in a contested MSPB hearing." (Exhibit BM: July 8, 2020 Neal Email and Letter, pp. 3) Despite this, the Agency refused to permit me additional time to provide responses to HS-FEMA-01522-2019's 600+ interrogatories. (Exhibit BN: ROI 991)

The Agency's October 25, 2021 Final Agency Decision (FAD) found that I failed to prove by a preponderance of the evidence that FEMA discriminated against me. According to the FAD, I could appeal it to the EEOC within 30 days. (Exhibit BO: HS-FEMA-01522-2019 FAD at 23) Although I objected to the facts accepted for investigation (the Agency split the claims), the Agency did not provide a response to my objection. (Exhibit BP: HS-FEMA-01522-2019 Objection to Claims)

According to Mrs. Gammon's October 16, 2019 Removal Decision, I had the right to appeal to MSPB no later than 30 days after the effective date of that action. (Exhibit BR: Ransom MSPB Appeal, pp. 20-21).

Mr. Neal appealed my wrongful termination to the MSPB in DC-0752-20-0145-I-1 on November 8, 2019. (Exhibit BQ: Ransom MSPB Acknowledgement Order); (Exhibit BR: Ransom

MSPB Appeal) November 8, 2019 was within 30 days of my October 17, 2019 wrongful termination. (Exhibit B: Mutual Separation and General Release); (Exhibit C: Oct 17, 2019 Mutual Separation and General Release Response) Mr. Neal first introduced the Prehearing Submission during the MSPB case. Notably, footnote 3 states that "In an effort to save time at the hearing, I admitted the appellant's statement of facts from her prehearing submission into the record. The appellant believes this statement provides background information to explain what happened to her before the agency proposed her removal." (ECF No. 1-2, MSPB Decision at 7) I also included the Prehearing Submission in 1:21-CV-01563-JMC. (1:21-CV-01563-JMC ECF 31-1, Memorandum of Law in Opposition to Motion to Dismiss or, in the Alternative, Transfer at 1)

The Prehearing Submission addressed Ms. Register's report of false safety concerns to FEMA's Security Office which resulted in Federal Protective Services (FPS) officers publicly detaining me at work. (Exhibit U: Prehearing Submission) The Prehearing Submission also includes Keith Johnson's deposition testimony that Mr. Langley withheld some doctors' slip from the Removal Proposal. Mrs. Gammon did not receive all the medical notes, she had to find that I was AWOL. The false FBI report from Keith Williams, a black male who Mr. Langley subsequently promoted to Deputy Director, is not included because I only learned of it via discovery since he made it anonymously. (Exhibit AA: Carla Gammon March 11, 2020 Deposition Testimony, pp. 168-170); (Exhibit BS: Agency Production of Documents 3219-3221) Despite the fact that no such violence occurred and FPS officers told Ms. Register and Ms. Langley that I was not a threat, Ms. Register did not correct Mr. Hennig. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 173-191) During this same time period, Richard Moore, a black acting branch chief at the time, told Joseph Fabre, Jr., a black male non-supervisory employee, that "senior leadership ... are communicating with security to make this a safe and pleasant work environment for all." I know that Mr. Fabre was referencing me because he mentioned "the large backpack that never seems to leave the individual's side."

(Exhibit BT: ROI 265-266) FEMA's Security Office told Ms. Register they could not search my backpack. (Exhibit BU: Mary Register March 11, 2020 Deposition Testimony, pp. 162, lines 7-21 – pp. 163, lines 1-2)

Finally, the Prehearing Submission addresses the Assistant Program Manager (APM) position. Despite the fact that I was among the most highly qualified for the APM position, Mrs. Register decided she would not submit my name with the top five candidates for Mr. Cochran to interview me. "Had I been fully considered and selected for this position, Mr. Langley, Ms. Register, and Mrs. Gammon would not have been able to terminate me from my former position, because I would have already assumed this new position." (Exhibit U: Prehearing Submission, pp. 58-59 of 80)

When asked why Ms. Register did not submit my name with the top five candidates for Mr. Cochran to interview me, she said initially that she would have to look at her analysis. Ms. Register then denied that the grievances I filed, outburst, and security issues were the reason she did not include me in the top five. Then, she admitted that Mr. Cochran saw the list. She gave him the top five and the next five. Ms. Register stated she did not include me in the top ten "based on going through every resume and marking the qualifications for that particular requirement based on that."

When asked why only my name was crossed out on the certificate and no other candidates, Ms. Register could not provide an explanation. Ms. Register admitted that she did not hold off on making a selection until the EEO investigation was completed, and she did not discuss this decision with Mr. Johnson. As Mr. Cochran's direct supervisor, Ms. Register admitted that Mr. Cochran would not make a hiring decision without first discussing it with her. Ms. Register did not remember if she and Mr. Cochran discussed whether she should hold off [on making a selection] since there was a pending EEO complaint. (Exhibit BU: Mary Register March 11, 2020 Deposition Testimony, pp. (193-197)

According to Ms. Register's analysis, which is on the selection certificate that she signed, she did not provide a reason for why she crossed out only my name. (Exhibit BV: APM Certificate, pp. 3) According to opm.gov, the selection certificate that Ms. Register received "rank ordered the eligible candidates based on the ranking procedure identified in the job opportunity announcement and eligible candidates identified in the fourth step of the Evaluate Applications element."[1] As a result of the Agency's decision to split the claims, the APM claim was never decided. It's not addressed in the FAD or the MSPB decision. (Exhibit BO: HS-FEMA-01522-2019 FAD); (ECF 1-2, MSPB Decision)

Judge Kasandra Robinson Styles issued MSPB initial decision affirming the Agency's wrongful termination on July 30, 2020 in DC-0752-20-0145-I-1. (ECF No. 1-2, MSPB Decision) According to the MSPB decision, I could request judicial review by the EEOC of my discrimination claims only, excluding all other issues, within 30 calendar days of the date this decision became final. (ECF No. 1-2, MSPB Decision at 61) DC-0752-20-0145-I-1 became final on September 3, 2020. (ECF No. 1-2, MSPB Decision at 55)

Mr. Neal appealed the MSPB's decision's discrimination claim to EEOC OFO in 2021000075 on October 3, 2020. (Exhibit BW: 2021000075 EEOC Acknowledgement Letter) October 3, 2020 was 30 calendar days of DC-0752-20-0145-I-1 becoming final. Mr. Neal acknowledged he made the appeal without a brief, apologized, and explained his position in a letter to EEOC. (Exhibit BX: Tilman Barnhart Letter) This appeal primarily focused on the failure to accommodate claim based on my autism diagnosis. Since I had not been diagnosed with autism at the time I filed HS-FEMA-01522-2019 with the Agency, I did not include

[1] Office of Personnel Management https://www.opm.gov/policy-data-oversight/human-capital-management/hiring-reform/hiring-process-analysis-tool/issue-certificate-and-notify-eligibles/ (last visited on 6/7/2023)

disability as a basis for discrimination. Once I became aware of my autism diagnosis and informed the Agency, my former attorney made the MSPB complaint a mixed case by adding disability. Although he referenced a physical disability it was for my autism, which does sometimes affect me physically. On May 24, 2021, the EEOC OFO affirmed the MSPB decision. (ECF No. 1-3, EEOC 2021000075 Decision) According to the decision, I had the right to file a civil action in an appropriate United States District Court, based on the MSPB decision, within 30 calendar days of the date I received that decision. (ECF No. 1-3); (EEOC 2021000075 Decision at 6)

I filed HS-FEMA-01742-2021 on November 2, 2021. (Exhibit BY: HS-FEMA-01742-2021 Notice of Partial Acceptance, pp. 1) As previously mentioned, Although Mr. Langley is named in it regarding his decision to exclude me from Logistics System's Deputy Director position, this complaint is not related to 1:22-CV-02355-GLR because it concerns additional claims of retaliation after HS-FEMA-01522-2019. I mentioned it in support of my positive response on Pro Se 7 Form, Complaint for Employment Discrimination, that I believe that defendants is/are still committing these acts against me. (ECF No. 1, Pro Se 7 at 4) Whether or not the EEOC has provided a response for HS-FEMA-01742-2021 is not relevant because HS-FEMA-01742-2021 is not related to 1:22-CV-02355-GLR.

I appealed HS-FEMA-01522-2019 to EEOC in 2022000766 based on harassment and discrimination, to include reinstatement, to EEOC on November 24, 2021. (Exhibit BZ: 2022000766 Acknowledgement Letter) November 24, 2021 is within 30 days of my receipt of the October 25, 2021 HS-FEMA-01522-2019 FAD. (Exhibit BO: HS-FEMA-01522-2019 FAD, pp. 23); (Exhibit CA: 2022000766 Updated EEO Complaint Info 1.4) The procedural arguments I mentioned in ECF No. 23, the April 11, 2023 Updated Statement of Facts, are

included in 2022000766, not 2021000075. (Exhibit CA: 2022000766 Updated EEO Complaint Info 1.4, pp. 3-4. They are indicative of harassment, discrimination, and disparate treatment. The EEOC affirmed the Agency's wrongful termination on January 31, 2023. (Exhibit CB: 2022000766 EEOC Decision) According to 2022000766, I had the right to file a civil action in an appropriate United States District Court within 90 calendar days from the date I received that decision. (Exhibit CB: 2022000766 Decision, pp. 8) By that time, I had already filed this instant action on September 15, 2022. (ECF 1-1: September 15, 2022 Statement of Facts)

I lodged 202204160, a third EEOC complaint regarding discrimination in which FEMA is named as the defendant. (Exhibit CD: 202204160 Acknowledgement Letter) 202204160 is an appeal of HS-FEMA-01742-2021. I mentioned it in support of my positive response on Pro Se 7 Form, Complaint for Employment Discrimination, that I believe that defendants is/are still committing these acts against me. (ECF No. 1, Pro Se 7 at 4) 202204160 is not related to 1:22-CV-01563-GLR.

I appealed 2021000075 to the United States District Court for the District of Maryland (Baltimore) in 1:21-CV-01563-JMC on June 23, 2021 regarding EEOC's decision to affirm the MSPB decision for my wrongful termination's failure to accommodate claim. (1:21-CV-01563-JMC ECF No. 1-4, Civil Cover Sheet); (1:21-CV-01563-JMC ECF No. 1, Pro Se 7); (1:21-CV-01563-JMC ECF No. 1-1, June 23, 2021 Statement of Facts) June 23, 2021 is within 30 days of the May 24, 2021 2021000075 EEOC decision. (ECF No. 1-3, EEOC 2021000075 Decision) Judge Caulson granted Defendants' Motion to Dismiss or Alternatively to Transfer, dismissing 1:21-CV-01563-JMC without prejudice on July 29, 2022. (1:21-CV-01563-JMC 46 ECF No. 36, Decision Order)

For the second time, I appealed 2021000075 to the United States District Court for the District of Maryland (Baltimore) in 1:22-CV-02355-GLR on September 15, 2022 regarding the EEO complaint for my wrongful termination's failure to accommodate claim. (ECF No. 1-4, Civil Cover Sheet); (ECF No. 1, Pro Se 7) Since 2022000766 was decided on January 21, 2023, it was not available at the time I filed 1:22-CV-02355-GLR. Therefore, I included it in 1:22-CV-02355-GLR for my wrongful termination based on HS-FEMA-01522-2019. (Exhibit CB: 2022000766 EEOC Decision) Thus far, I have submitted the initial pleading and Statements of Facts, which I have updated three times. (ECF No. 1, Pro Se 7); (ECF No. 1-1, September 15, 2022 Statement of Facts); (ECF No. 8, November 17, 2022 Updated Statement of Facts); (ECF No. 12, December 29, 2022 Updated Statement of Facts); (ECF No. 23, April 11, 2023 Updated Statement of Facts at 3) I most recently filed my Reply to Motion to Dismiss or Transfer on June 9, 2023. (ECF 23: Memorandum of Law in Opposition to Motion to Dismiss or, in the Alternative, Transfer)

## II.    LEGAL STANDARDS

### A.  Fed. R. Civ. P. Rule 15(a)(2)

Fed. R. Civ. P. Rule 15(a)(2) permits other amendments before trial. According to Fed. R. Civ. P. Rule 15(a)(2), "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Ms. Marzullo refused to provide consent; therefore, I am requesting to amend because justice so requires.

## III.   ARGUMENT

### A.  Plaintiff's proposed amended pleading would not cause undue delay.

My proposed amended pleading would not cause undue delay. On the contrary, as a result of Ms. Marzullo's most recent extension through July 26, 2023, this action causes no undue delay.

(ECF 33: Order Granting Defendant's Motion for Extension) This is Defendants' second Motion for an Extension.[2]

Ms. Marzullo has requested extensions for reasons entirely unrelated to 1:22-cv-02355-GLR including her vacation and a trial for another case, etc. (ECF 24); (ECF 32) Although Ms. Marzullo's extensions prejudice me, she has written to this Court on multiple occasions that they do not. (ECF 24): (ECF 32) These are blatant falsehoods that constitute lack of candor to this Court. Ms. Marzullo's multiple extensions did prejudice me and I *remain* prejudiced by them. Justice delayed is justice denied. Based on Ms. Marzullo's multiple extension requests, my amended pleading would not cause her any undue delay; in fact, she will receive it during the extension she received.

**B. Plaintiff's proposed amended pleading is not submitted in bad faith.**

My proposed amended pleading is not submitted in bad faith. Since filing 1:22-CV-02355-GLR, I have balanced working a non-legal job, interning for a judge, a full class load for fall and spring semesters, and preparing for and taking law school exams. I do not have the luxury of previously obtained trial experience. Moreover, the Agency is aware of my autism diagnosis. Furthermore, I am representing myself in this matter; therefore, my pleadings should be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

**C. Plaintiff's proposed amended pleading does not follow repeated failure to cure deficiencies in previous amendments.**

My proposed amended pleading does not follow repeated failure to cure deficiencies in previous amendments. This is my first time amending the complaint. The procedural arguments I mentioned in ECF No. 23, the April 11, 2023 Updated Statement of Facts, are included in 2022000766, not 2021000075. (Exhibit CA: 2022000766 Updated EEO Complaint Info 1.4, pp. 3-4) While I have

[2] Ms. Marzullo previously received an extension from April 17, 2023 up to and including May 8, 2023.

updated the Statement of Facts after filing it, during that time I have balanced working a non-legal

job, interning for a judge, a full class load for fall and spring semesters, and preparing for and taking law school exams. I do not have the luxury of previously obtained trial experience. Moreover, the Agency is aware of my autism diagnosis. Furthermore, I am representing myself in this matter; therefore, my pleadings should be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Since June, 2023, I have been a full-time law clerk working 40 hours weekly while maintaining my part-time non-legal job working up to 35 hours weekly. What's more, since the Defendants were not properly served until February 15, 2023,[3] I only amended the Statement of Facts once after February 15, 2023; therefore, it does not rise to a repeated failure to cure deficiencies. (ECF # 23: April 11, 2023 Updated Statement of Facts)

**D. Plaintiff's proposed amended pleading would not unduly prejudice the Defendants.**

My proposed amended pleading would not unduly prejudice the Defendants. Granting my proposed amendment would not be improper or unfair to the Defendants. On the contrary, it would provide them a better representation of what is already in the record because everything I have included in this amendment is already in the record. My proposed amendment would allow Ms. Marzullo to provide a response that is based on more of what is already in the record. As an attorney, Ms. Marzullo has had more experience developing motions to dismiss. As previously mentioned, I am learning much of this on the go since I represent myself.

**E. Plaintiff's proposed amended pleading is not futile to accept.**

[3] As a result of the Court's Show Cause Order, Defendants were properly served on February 17, 2023. (ECF 13: Show Cause Order); (ECF 19: Defendants' Certificate of Service)

My proposed amended pleading is not futile to accept. On the contrary, the Agency has

already accepted the basis of much of it into the record in the Prehearing Submission (Exhibit U: Prehearing Submission) Specifically, since the basis of 1:22-CV-02355-GLR is my wrongful termination and the Agency has admitted into the record that I was among the most highly qualified for the APM position, and that I was not properly considered for the APM position, had I been properly considered for the APM position, I may not have been terminated. (Exhibit U: Prehearing Submission, pp. 58-59 of 80) Therefore, it appears that it would not be futile to accept my proposed amended pleading. This is in addition to everything else that the Agency has admitted into the record, including withholding doctors' slips from the Removal Proposal to make me absent without leave, being publicly detained at work by Federal Protective Service officers, an improper order to do user account manager work, reporting false safety concerns to FEMA's Security Office, etc. (Exhibit U: Prehearing Submission) Besides what the Agency has admitted into the record in the Prehearing Submission, the MSPB decision, Agency Production of Documents and deposition testimony address Mr. Williams's anonymous false report to the Federal Bureau of Investigation about me. (ECF 1-2: MSPB Decision, pp. 48)

**F. CONCLUSION**

It is too late in the day and entirely contrary to the spirit of the Fed. R. Civ. P. for decisions on the merits to be avoided on the basis of such mere technicalities. The Fed. R. Civ. P. rejecst the approach that pleading is a game of skill in which one misstep by counsel may be decisive of the outcome, and accepts the principle that the purpose of pleading is to facilitate a proper decision on the merits. *Foman v. Davis*, 371 U.S. 178, 181-182 (1962) (citing *Conley v. Gibson*, 355 U.S. 41, 48 (1957)) Based on the foregoing, I respectfully request that the Court grant this motion and grant this amended pleading.

Respectfully submitted,

By: [signature]
Eyphra Ransom
Plaintiff
101 W Read St. Apt. 605
Baltimore, Maryland 21201
(202)774-8103
ransomeyphra@yahoo.com

Exhibit CR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Eyphra Ransom
101 West Read St. Apt. 605
Baltimore, MD 21201
*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**-against-**

Alejandro N. Mayorkas DHS Secretary
245 Murray Lane SW
Washington, DC 20538-0305
*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**Complaint for Employment Discrimination**

Case No. 1:22-CV-02355-GLR
*(to be filled in by the Clerk's Office)*

Jury Trial: ☐ Yes ☒ No
*(check one)*

Exhibit CS

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Eyphra Ransom |
| Street Address | 101 W Read St. Apt. 605 |
| City and County | Baltimore, Baltimore City |
| State and Zip Code | MD 21201 |
| Telephone Number | |
| E-mail Address | |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Alejandro N. Mayorkas |
| Job or Title (if known) | DHS Secretary |
| Street Address | 245 Murray Lane SW |
| City and County | Washington |
| State and Zip Code | DC 20538-0305 |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | Deanne Criswell |
| Job or Title (if known) | Federal Emergency Management Agency Admin |
| Street Address | 500 C St. SW |
| City and County | Washington |
| State and Zip Code | DC 20024 |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address (if known) | |

*(If there are more than three defendants, attach an additional page providing the same information for each additional defendant.)*

**C. Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is:

| | |
|---|---|
| Name | Federal Emergency Management Agency |
| Street Address | 500 C St. SW |
| City and County | Washington |
| State and Zip Code | DC 20024 |
| Telephone Number | |

Exhibit CS

## II. Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☒ Other federal law *(specify the federal law)*:

Rehabilitation Act of 1973; 29 U.S.C. Sections 791, 794; disparate treatement; hostile work environment; harassment; 29 C.F.R. Part 1614.

☐ Relevant state law *(specify, if known)*:

______________________________

☐ Relevant city or county law *(specify, if known)*:

______________________________

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Exhibit CS

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☒ Failure to hire me.
- ☒ Termination of my employment.
- ☐ Failure to promote me.
- ☒ Failure to accommodate my disability.
- ☐ Unequal terms and conditions of my employment.
- ☒ Retaliation.
- ☒ Other acts *(specify)*: harassment; hostile work environment; see Statement of Facts and Exhibits.

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)

Feb 2018 - Oct 2019 for this case

C. I believe that defendant(s) *(check one)*:

- ☒ is/are still committing these acts against me.
- ☐ is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☒ race African American
- ☒ color black
- ☒ gender/sex female
- ☐ religion ____________________
- ☐ national origin ____________________
- ☐ age. My year of birth is ____________. *(Give your year of birth only if you are asserting a claim of age discrimination.)*
- ☒ disability or perceived disability *(specify disability)*

  autism

Exhibit CS

E. The facts of my case are as follows. Attach additional pages if needed.

Please see attached Statement of Facts and Exhibits.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

HS-FEMA-01522-2019 Appeal: 10/3/20 DC-0752-20-0145-I-1 Appeal: 11/24/21

B. The Equal Employment Opportunity Commission *(check one)*:

☐ has not issued a Notice of Right to Sue letter.

☒ issued a Notice of Right to Sue letter, which I received on *(date)* HS-FEMA-01522-2019: 1/31/23 DC-0752-20-0145-I-1: 5/24/21.

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐ 60 days or more have elapsed.

☒ less than 60 days have elapsed.

Exhibit CS

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Please see attached Statement of Facts.

Exhibit CS

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: July 14, 2023

Signature of Plaintiff ______________________

Printed Name of Plaintiff Eyphra Ransom

*(If more than one plaintiff is named in the complaint, attach an additional certification and signature page for each additional plaintiff.)*

### B. For Attorneys

Date of signing: __________, 20__.

Signature of Attorney ______________________
Printed Name of Attorney ______________________
Bar Number ______________________
Name of Law Firm ______________________
Address ______________________
Telephone Number ______________________
E-mail Address ______________________

Exhibit CS

**UNITED STATES DISTRICT COURT OF MARYLAND**

**NORTHERN DIVISION**

**JULY 14, 2023 UPDATED STATEMENT OF FACTS**

1. I previously worked at FEMA Headquarters (HQ) in Washington, DC as a Logistics Management Specialist. (ECF No. 23, April 11, 2023 Updated Statement of Facts at 1) I received notice of my proposed removal on August 21, 2019. (Exhibit A: Removal Proposal) The reasons for my proposed removal were failure to follow instructions, absence without leave, lack of candor, and inappropriate behavior. (Exhibit A: Removal Proposal, pp. 1-4) On October 16, 2019, I received Agency's decision to remove me from federal serve effective October 17, 2019 with a Mutual Separation and General Release Agreement. (Exhibit B: Mutual Separation and General Release) Carla Gammon, a white female and the Deciding Official for my termination as Mr. Langley's supervisor, signed the Mutual Separation and General Release Agreement on behalf of the Agency. The Mutual Separation and General Release gave me 24 hours to withdraw HS-FEMA-01522-2019 and agree not to work for the Department of Homeland Security (DHS) for three years in exchange for being allowed to resign. (Exhibit B: Mutual Separation and General Release) The Mutual Separation and General Release Agreement did not address my security clearance for future federal employment or my SF-50. I did not sign it. (Exhibit C: Oct 17, 2019 Mutual Separation and General Release Response)
2. On June 24, 2019, FEMA received HS-FEMA-01522-2019, the first formal discrimination complaint on the bases of race, gender, and retaliation. (Exhibit L: HS-FEMA-01522-2019); (Exhibit BJ: HS-FEMA-01522-2019 Postage Envelope) I subsequently updated it twice. (Exhibit AR: HS-FEMA-01522-2019 Nov 27 2019 Update); (Exhibit BK: HS-FEMA-01522-2019 Dec 2 2019 Update) Importantly, the Agency excluded multiple letters from Mr. Neal in

the Report of Investigation. (Exhibit BL: April 14, 2020 Neal Letter); (Exhibit BM: July 8, 2020 Neal Email and Letter) In the July 8, 2020 Neal Email and Letter, Mr. Neal wrote that he had lost all confidence in the investigator and requested that the Agency assign a new investigator. (Exhibit BM: July 8, 2020 Neal Email and Letter, pp. 3) Mr. Neal requested "that a new investigator be assigned who at a minimum has appropriate training and experience to be sensitive to and effectively interact with my autistic client and objectively work with her to ensure her side of the story is heard." (Exhibit BM: July 8, 2020 Neal Email and Letter, pp. 3) Mr. Neal went on to write that "While the Agency has missed every deadline in its initial handling of this case, the contract investigator is now placing unreasonable time restraints on my client, along with constant threats that she will be considered "' non-compliant.' " All this while my client was concurrently preparing and participating in a contested MSPB hearing." (Exhibit BM: July 8, 2020 Neal Email and Letter, pp. 3) Despite this, the Agency refused to permit me additional time to provide responses to HS-FEMA-01522-2019's 600+ interrogatories. (Exhibit BN: ROI 991)

3. The Agency's October 25, 2021 Final Agency Decision (FAD) found that I failed to prove by a preponderance of the evidence that FEMA discriminated against me. According to the FAD, I could appeal it to the EEOC within 30 days. (Exhibit BO: HS-FEMA-01522-2019 FAD at 23) Although I objected to the facts accepted for investigation (the Agency split the claims), the Agency did not provide a response to my objection. (Exhibit BP: HS-FEMA-01522-2019 Objection to Claims)

4. According to Mrs. Gammon's October 17, 2019 Removal Decision, I had the right to appeal to MSPB no later than 30 days after the effective date of that action. (Exhibit BR: Ransom

MSPB Appeal, pp. 20-21).

5. Mr. Neal appealed the Agency's October 17, 2019 removal to the MSPB in DC-0752-20-0145-I-1 on November 8, 2019. (Exhibit BQ: Ransom MSPB Acknowledgement Order); (Exhibit BR: Ransom MSPB Appeal) November 8, 2019 was within 30 days of my October 17, 2019 wrongful termination. (Exhibit B: Mutual Separation and General Release); (Exhibit C: Oct 17, 2019 Mutual Separation and General Release Response) Mr. Neal first introduced the Prehearing Submission during the MSPB case. Notably, footnote 3 states that "In an effort to save time at the hearing, I admitted the appellant's statement of facts from her prehearing submission into the record. The appellant believes this statement provides background information to explain what happened to her before the agency proposed her removal." (ECF No. 1-2, MSPB Decision at 7) I also included the Prehearing Submission in 1:21-CV-01563-JMC. (1:21-CV-01563-JMC ECF 31-1, Memorandum of Law in Opposition to Motion to Dismiss or, in the Alternative, Transfer at 1)

6. Judge Kasandra Robinson Styles issued MSPB initial decision affirming the Agency's wrongful termination on July 30, 2020 in DC-0752-20-0145-I-1. (ECF No. 1-2, MSPB Decision) According to the MSPB decision, I could request judicial review by the EEOC of my discrimination claims only, excluding all other issues, within 30 calendar days of the date this decision became final. (ECF No. 1-2, MSPB Decision at 61) DC-0752-20-0145-I-1 became final on September 3, 2020. (ECF No. 1-2, MSPB Decision at 55)

7. In DC-0752-20-0145-I-1's initial appeal, my former attorney alleged multiple defenses that are the basis of this appeal:

   a)    Charges and specifications should have not been sustained/lacked supporting evidence. – Evidence in the record supports this defense.

b)      Douglas Factors were considered errantly or misapplied. – Evidence in the record supports this defense.

c)      Harmful Procedural Error:  Employee was not provided with the materials used by Agency in its decision making. Appellant did not have adequate access to materials in making response to proposal.

d)      Unlawful Discrimination – Appellant was discriminated against for her physical disabilities. (Exhibit BR: Ransom MSPB Appeal, pp. 6)

8.      In DC-0752-20-0145-I-1's Prehearing Submission, my former attorney alleged multiple other defenses:

a.      Agency's Burden of Proof Based on Preponderance of Evidence – The Appellant challenges the truthfulness of the actual facts alleged. If the facts are not proven by a preponderance, the charge itself should not be sustained.

b.      Prohibited Personnel Practice – 5 U.S.C. § 2302(b) states that any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority… discriminate for or against any employee or applicant for employment…on the basis of handicapping condition, as prohibited under Section 501 of the Rehabilitation Act of 1973 (29 U.S.C. [§] 791).

c.      Disability Discrimination – The Agency did not adequately accommodate for, or consider mitigating factors involved with the Appellant's diagnosis of autism and other medical conditions for which she was seeking treatment. For example, the Agency in this case issued absent without leave (AWOL) charges on the basis of disability discrimination. The Appellant is a person with a disability entitled to the protection of disability discrimination laws. *Davis v. Department of Veterans Affairs*, 106 M.S.P.R. 654 (2007). In this case, the AWOL charges were

related mostly for medical issues including her poor eyesight. Other charges were related to, or the situation complicated by her autism.

d. Vagueness of Charges – In this case the charges were too vague and thus did not provide a legitimate opportunity to respond. See *Mason v. Dep't. of Navy*, 70 M.S.P.R. 584 (1996). The reference to "inappropriate behavior" simply is not adequately defined for the Appellant to have known that her actions would subject her to discipline.

e. Disparate Treatment – Other employees have engaged in similar conduct to the Appellant, but have not been charged with discipline, or have not been removed from the service. The Appellant's disciplinary penalty is different and out of line with what other similarly situated employees have received for similar misconduct. *Fearon v. Dept. of Labor*, M.S.P.R. 428, 434 ¶ 11 (2005). Other similarly situated employees in the office (and under the same change of command) have been found to have committed similar inappropriate conduct but were not disciplined at all. See *Boucher v. U.S. Postal Service*, 118 M.S.P.R. 640, ¶ 20 (2012).

Consistency of the discipline in such cases is a part of the Douglas factor mitigation analysis. In this case, the deciding officials claims that the penalty was consistent with a table of comparables, but they clearly were not. In proving the disparate penalty claim, the MSPB has found that an appellant has to establish that the charges and the circumstances surrounding the charged behavior are "substantially similar." Doing so in the past required proof that the comparable penalty involved an employee in the same work unit, with the same supervisor, who was subjected to the same standards governing discipline. *Von Muller v. Dep't. of Energy*, 101 M.S.P.R. 91, ¶ 22, aff'd, 204 F. App'x 17 (Fed. Cir. 2006). However, the chain of command issue has changed under *William v. SSA*, 586 F.3d 1365 (Fed. Cir. 2009) (Agency must explain why different chain of command justifies a different penalty). Since Williams, the MSPB has

avoided hard and fast rules regarding disparate penalty issue, opting for an overall review of the facts at issue to determine whether a basis exists for the disparate penalty between similar employees with similar misconduct.

f. Elements Needed to Prove Lack of Candor – Lack of candor generally requires that an agency prove two elements according to *Fargnoli v. Dept. of Commerce*, 2016 MSPB 19. These are: 1) The federal employee gave incorrect or incomplete information; and 2) The federal employee (he/she) did so knowingly. The MSPB Board also found that the "element of deception" required under *Ludlum* entailed that the employee must have "knowingly" failed to be forthright. See *Parkinson v. DOJ*, 815 F. 3d at 766-67).

g. Improper Penalty Analysis – The penalty analysis is governed by *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 305-06 (1981). In *Douglas*, the MSPB held that 12 factors ("Douglas Factors") must be considered when evaluating possible penalties for disciplinary cases involving federal employees. A federal supervisor is responsible for ensuring that a disciplinary penalty is fair and reasonable. If a penalty is disproportionate to the alleged violation or is unreasonable under *Douglas*, it is subject to being reduced or reversed by the MSPB, even if the charges would otherwise be sustained.

h. Consideration of Lesser Penalties – An agency must give "substantive consideration to a lesser penalty." *Banez v. Dep't. of Defense*, 69 M.S.P.R. 642, 650 (1996). The Douglas Factors described by the proposing and deciding officials inadequately justify not using progressive discipline or a lesser penalty in this case. If a deciding official fails to appropriately consider relevant factors, the MSPB does not need to defer to the agency's penalty determination. And if the MSPB finds the agnecy's original penalty to be too severe, it may mitigate it to the maximum reasonable penalty. *Lachance v. Devall*, 178 F.3d 1246, 1260 (Fed. Cir. 1999).

i. Mitigation of Penalties – The Administrative Judge should mitigate the removal decision in this case because the agency failed to weigh relevant factors and thus the penalty exceeds the bounds of reasonableness. See *Toth v. U.S.P.S.*, 76 M.S.P.R. 36, 39 (1997). While penalty selection is generally a matter of federal agency discretion, the MSPB will review a case to ensure that penalty judgement has been properly exercised. In this case, even if the charges are sustained, the Administrative Judge should mitigate the penalty of removal to something less than removal from the federal service. The Administrative Judge should mitigate to the maximum reasonable penalty because the Deciding Official failed to demonstrate that she considered the relevant mitigating factors including the comparables chart and the Appellant's autism, before deciding upon the penalty. *Cunningham v. U.S.P.S.*, 109 M.S.P.R. 402, ¶ 24 (2008).

j. Harmful Procedural Error – Reversal of a personnel decision is required where a federal agency commits harmful error which significantly impairs a federal employee's rights. 5 C.F.R. § 1201.56(c)(3). Generally, before a federal employee can be disciplined for alleged misconduct or performance deficiencies, they are entitled to due process of law. The core of due process for disciplinary actions consists of (1) notice of the misconduct or performance issues; and (2) the opportunity to respond to these issues. *Ward v. U.S. Postal Service*, 634 F.3d 1274, 1280 (Fed. Cir. 2011). A federal employee must be given a meaningful opportunity to invoke the decision maker's discretion before a personnel action is finalized. *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 546 (1985).

When a federal employee is able to show that the application of the agency's procedures were not in accordance with statute, rule or regulation, the MSPB may order a reversal. *Jones v. Dept. of Treas.*, 93 M.S.P.R. 494, 499 (2003). In this case, the Deciding Official was made aware

that the Appellant could not access necessary information for her response because she did not have access to her work computer. The Deciding Official ignored this issue. Additionally, the Deciding Official relied upon information she reviewed outside of the proposal which had been presented to the Appellant. Thus, the Appellant had no fair notice of those things she needed to respond to.

In *Jenkins v. EPA*, 2012 MSPB 70 (May 4, 2012), the Board reversed a removal decision by a federal agency because it had not provided due process to the federal employee involved. In that case, the federal employee had been proposed for removal from her position with the EPA. The Agency then removed the employee, allegedly relating to threats made and abusive language in the workplace. The employee appealed to the MSPB, but an administrative judge dismissed her claims, upholding the removal. The employee then filed for review of the decision by the Board of the MSPB.

The MSPB reviewed and reversed the administrative judge because the federal agency had denied the federal employee minimum due process of law. In particular, the MSPB found that the Agency had failed to give the employee notice of an aggravating penalty factor used as a basis for discipline in her case, ruling that: "when an agency intends to rely on an aggravating factor as the imposition of a penalty, such factors should be included in the advance notice of [the] adverse action so that the employee will have a fair opportunity to respond to those factors before the deciding official." *Jenkins*, at 4.

Administrative judge should take care in cases involving information used by a deciding official in a disciplinary action which was provided to a federal employee prior to a decision being made on discipline. The *Jenkins* decision make it clear that the Board believes that federal

agencies, prior to making adverse action decisions, must first provide federal employees advance notice of significant information relating to proposed adverse actions.

A federal agency must provide copies of all information relied upon in the processing of a disciplinary action in order to prepare for their response to the proposed action. The Deciding Official in this case considered important information that was not provided to the Appellant. This is a basis for reversal of the action. New information, not provided to a federal employee is considered "*ex parte* communications." The U.S. Court of Appeals for the Federal Circuit has held that *ex parte* communications that introduce new and material information about a federal employee's case to a deciding official constitutes a due process violation. *Stone v. Federal Deposit Insurance Corporation*, 179 F.3d 1368, 1376-77 (Fed. Cir. 1999).

The Federal Circuit Court of Appeals in *Ward v. USPS*, 634 F.3d 1274 (Fed. Cir. 2011) held that information not provided to an employee regarding penalty determinations (under the Douglas Factors) were also subject to due process:

> "*Ex parte* communications that introduce new and material information whether material to the merits of the underlying charge or material to the penalty to be imposed, violate due process. There is no constitutionally relevant distinction between *ex parte* communications relating to the underlaying charge and those relating to the penalty."

According to her deposition, the Deciding Official decided on sustaining removal based upon information that was not provided to the Appellant prior to the oral and written response stages. This is reversible error.

k. Error in Considering the Table of Penalties – The disciplinary penalty assessed in this case does not meet the description used in the agency's Table of Penalties. See *Brenner v. DOI*, 116 M.S.P.R. 482 (2011) (MSPB upholding administrative judge's ruling mitigating discipline because the federal agency had misinterpreted their Table of Penalties). The language cited by

the proposing and deciding officials does not fit the charge and penalty that was assessed. In this case, they misinterpreted the charge of failing to follow an instruction as the charge of insubordination and therefore improperly considered removal.

The comparables chart shows that similarly situated employees have received lesser penalties in the past which conflict with a deciding official's application of the Table of Penalties. The Appellant received a removal action for being AWOL, but other employees have received lesser penalties for the same offense. (Exhibit U: Prehearing Submission, pp. 4-11 of 80)

9.    Mr. Neal appealed the MSPB's decision's discrimination claim to EEOC OFO in 2021000075 on October 3, 2020. (Exhibit BW: 2021000075 EEOC Acknowledgement Letter) October 3, 2020 was 30 calendar days of DC-0752-20-0145-I-1 becoming final. Mr. Neal acknowledged he made the appeal without a brief, apologized, and explained his position in a letter to EEOC. (Exhibit BX: Tilman Barnhart Letter) This appeal primarily focused on the failure to accommodate claim based on my autism diagnosis. Since I had not been diagnosed with autism at the time I filed HS-FEMA-01522-2019 with the Agency, I did not include disability as a basis for discrimination. Once I became aware of my autism diagnosis and informed the Agency, my former attorney made the MSPB complaint a mixed case by adding disability. Although he referenced a physical disability it was for my autism, which does sometimes affect me physically.

On May 24, 2021, the EEOC OFO affirmed the MSPB decision. (ECF No. 1-3, EEOC 2021000075 Decision) According to the decision, I had the right to file a civil action in an appropriate United States District Court, based on the MSPB decision, within 30 calendar days of the date I received that decision. (ECF No. 1-3: EEOC 2021000075 Decision

at 6)

10. I filed HS-FEMA-01742-2021 on November 2, 2021. (Exhibit BY: HS-FEMA-01742-2021 Notice of Partial Acceptance, pp. 1) As previously mentioned, Although Mr. Langley is named in it regarding his decision to exclude me from Logistics System's Deputy Director position, this complaint is not related to 1:22-CV-02355-GLR because it concerns additional claims of retaliation after HS-FEMA-01522-2019. I mentioned it in support of my positive response on Pro Se 7 Form, Complaint for Employment Discrimination, that I believe that defendants is/are still committing these acts against me. (ECF No. 1, Pro Se 7 at 4) Whether or not the EEOC has provided a response for HS-FEMA-01742-2021 is not relevant because HS-FEMA-01742-2021 is not related to 1:22-CV-02355-GLR.

11. I appealed HS-FEMA-01522-2019 to EEOC in 2022000766 based on harassment and discrimination, to include reinstatement, on November 24, 2021. (Exhibit BZ: 2022000766 Acknowledgement Letter) November 24, 2021 is within 30 days of my receipt of the October 25, 2021 HS-FEMA-01522-2019 FAD. (Exhibit BO: HS-FEMA-01522-2019 FAD, pp. 23); (Exhibit CA: 2022000766 Updated EEO Complaint Info 1.4) The procedural arguments I mentioned in ECF No. 23, the April 11, 2023 Updated Statement of Facts, are included in 2022000766, not 2021000075. (Exhibit CA: 2022000766 Updated EEO Complaint Info 1.4, pp. 3-4. They are indicative of harassment, discrimination, and disparate treatment. The EEOC affirmed the Agency's wrongful termination on January 31, 2023. (Exhibit CB: 2022000766 EEOC Decision) According to 2022000766, I had the right to file a civil action in an appropriate United States District Court within 90 calendar days from the date I received that decision. (Exhibit CB: 2022000766 Decision, pp. 8) By that time, I had already filed this instant action on September 15, 2022. (ECF 1-1: September

15, 2022 Statement of Facts)

12. The procedural arguments I mentioned in 2022000766 are indicative of harassment, discrimination, and disparate treatment.

a) The agency failed to develop an appropriate and impartial record upon which to make findings on the claims raised by the written complaint under Section 1614.108(b) of Title 29 C.F.R. The Agency failed to complete the Report of Investigation. The EEO investigator failed to include all documentation she received from my former attorney and me. Although I amended the complaint to include the removal and termination, the EEO investigator did not question any respondents regarding those specific subjects. Mr. Daniel Piccaluga and Ms. Grace Tilman, the attorneys who represent the Agency for 2022000766, also represented the Agency for MSPB decision DC-0752-20-0145-I-1. As Agency representatives, they participated in the case. Therefore, they had access to case transcripts. Furthermore, Ms. Tilman also represented the Agency for EEOC OFO decision 2021000075. As Agency representative, Ms. Tilman received the entire EEOC OFO complaint file that EEOC served to her for EEOC OFO decision 2021000075.

b) Despite the fact that the agency was aware that I was defending a contested MSPB case, that I was autistic, and that I received an excessively large amount of interrogatories and rebuttals, I was not provided enough time to answer the interrogatories, provide required documentation, and answer rebuttals. The Agency did not provide a response to my former attorney's letter requesting additional time for these purposes. I received 453 interrogatories and 87 rebuttals. I was required to provide three requests for information, one of which had multiple follow up questions. The interrogatories, rebuttals, and requests for information required extremely detailed answers.

c) The Agency's investigation went beyond the time granted based on EEOC MD-110[1]. The Agency's investigation lasted over 1 ½ years.

d) The investigator did not remain neutral as required under EEOC MD-110. For at least one question, the EEO investigator provided the answer to a respondent. The investigator also was not thorough, as required by EEOC MD-110. The EEO investigator failed to include all documentation she received from my former attorney and I. Although I amended the complaint to include the removal and termination, the EEO investigator did not question any respondents regarding those specific subjects.

e) The Agency did not avoid conflicts of interest, as required by EEOC MD-110. First, every agency head has a statutory obligation to eradicate unlawful employment discrimination that may occur within the agency. This anti-discrimination responsibility is what requires federal agencies to administer a fair and impartial investigative process designed to determine the validity of complaints, as well as to employ affirmative efforts to root out discrimination and ensure equal employment opportunity. The agency head designates the Director of the Office responsible for the agency's EEO programs to carry out this obligation. in my case, FEMA's Director of the Office of Equal Rights (OER), who is also an attorney representing the Agency for 2022000766, Ms. Jo Linda Johnson, personally approved additional time for my former supervisor, Mr. Kevin Langley, to complete his responses for the EEO investigator. She was also on the email where my request for additional time to complete my responses was denied.

13. I lodged 202204160, a third EEOC complaint regarding discrimination in which

[1] EEOC.gov https://www.eeoc.gov/federal-sector/management-directive/revised-md-110-reference-guide-september-2015 (last visited July 12, 2023) The revised MD-110 provides federal agencies with Commission policies, procedures, and guidance relating to the processing of employment discrimination complaints governed by the Commission's regulations in 29 C.F.R. Part 1614.

FEMA is named as the defendant. (Exhibit CD: 202204160 Acknowledgement Letter) 202204160 is an appeal of HS-FEMA-01742-2021. I mentioned it in support of my positive response on Pro Se 7 Form, Complaint for Employment Discrimination, that I believe that defendants is/are still committing these acts against me. (ECF No. 1, Pro Se 7 at 4) 202204160 is not related to 1:22-CV-01563-GLR.

14. I appealed 2021000075 to the United States District Court for the District of Maryland (Baltimore) in 1:21-CV-01563-JMC on June 23, 2021 regarding EEOC's decision to affirm the MSPB decision for my wrongful termination's failure to accommodate claim. (1:21-CV-01563-JMC ECF No. 1-4, Civil Cover Sheet); (1:21-CV-01563-JMC ECF No. 1, Pro Se 7); (1:21-CV-01563-JMC ECF No. 1-1, June 23, 2021 Statement of Facts) June 23, 2021 is within 30 days of the May 24, 2021 2021000075 EEOC decision. (ECF No. 1-3, EEOC 2021000075 Decision) Judge Caulson granted Defendants' Motion to Dismiss or Alternatively to Transfer, dismissing 1:21-CV-01563-JMC without prejudice on July 29, 2022. (1:21-CV-01563-JMC 46 ECF No. 36, Decision Order)

15. For the second time, I appealed 2021000075 to the United States District Court for the District of Maryland (Baltimore) in 1:22-CV-02355-GLR on September 15, 2022 regarding the EEO complaint for my wrongful termination's failure to accommodate claim. (ECF No. 1-4, Civil Cover Sheet); (ECF No. 1, Pro Se 7) Since 2022000766 was decided on January 21, 2023, it was not available at the time I filed 1:22-CV-02355-GLR. Therefore, I included

it in 1:22-CV-02355-GLR for my discrimination based on HS-FEMA-01522-2019. (Exhibit CB: 2022000766 EEOC Decision) Thus far, I have submitted the initial pleading and Statements of Facts, which I have updated three times. (ECF No. 1, Pro Se 7); (ECF No. 1-1, September 15, 2022 Statement of Facts); (ECF No. 8, November 17, 2022 Updated Statement of Facts); (ECF No. 12, December 29, 2022 Updated Statement of Facts); (ECF No. 23, April 11, 2023 Updated Statement of Facts at 3) I most recently filed my Reply to Motion to Dismiss or Transfer on June 9, 2023. (ECF 23: Memorandum of Law in Opposition to Motion to Dismiss or, in the Alternative, Transfer)

16. To state a prima facie case of Title VII discrimination, a claim must allege: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 566 U.S. 30 (2012).

17. I allege membership in a protected class in HS-FEMA-01522-2019. The Agency's own statement of the case states that my discrimination complaint was based on race, sex (female), and retaliation from prior EEO activity. (Exhibit L: HS-FEMA-01522-2019, Agency File pp. 38) I selected race, sex (female), and retaliation/reprisal on the DHS Individual Complaint of Employment Discrimination. (Exhibit L: HS-FEMA-01522-2019, Agency File pp. 40) In the Complaint, I identify my race and gender by stating "I am a black female." (Exhibit L: HS-FEMA-01522-2019, Agency File pp. 48) Moreover, EEOC decision 2022000766 states that "Complainant filed a formal EEO complaint alleging that the Agency subjected her to hostile workplace discrimination on the bases of race (African-American), sex (female), and reprisal for protected EEO activity…." (Exhibit CB: EEOC Decision 2022000766, pp. 1)

18. What's more, I delineated the race, gender, disability, and retaliatory bases for my discrimination throughout the Prehearing Submission for DC-0752-20-0145-I-1, the MSPB case, in HS-FEMA-01522-2019, in HS-FEMA-01522-2019's updates, and the brief for EEOC decision 2022000766. (Exhibit U: Prehearing Submission); (Exhibit L: HS-FEMA-01522-2019) (Exhibit AR: HS-FEMA-01522-2019 Nov 27 2019 Update); (Exhibit BK: HS-FEMA-01522-2019 Dec 2 2019 Update); (Exhibit CA: 2022000766 Updated EEO Complaint Info 1.4)

19. Additionally, I allege that my job performance was satisfactory. As previously stated, prior to 2018, there were no negative comments in my performance reviews and appraisals. Starting in the second quarter of 2018, Mr. Langley began inserting negative, unverified comments into my performance reviews and appraisals. Specifically, Mr. Langley acknowledged that as of December 2018, at the end of the performance evaluation, I went from a 3.8 out of 5, which indicated exceeded expectations, to a 0. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 248, lines 6-21 – pp. 249, lines 1-17)

20. Finally, I identify similarly situated employees outside of my protected classes and allege that I was treated differently than those employees. JaNina DeJesus, an Asian female employee who directly reported to Mr. Langley at the time I did, failed to follow Mr. Langley's instructions at least once regarding finding someone to conduct Field Call for when she was not available. (Exhibit L: HS-FEMA-01522-2019, Agency File pp. 100; 135) Mr. Langley did not attempt to discipline her. According to Keith Johnson's deposition testimony, there was a review of comparators, and to his understanding, Mr. Langley had never issued discipline to another employee under their supervision. (Exhibit Y: Keith Johnson February 5, 2020 Deposition Testimony, pp. 184-187) According to the Prehearing Submission, both Mr. Langley and Ms.

Register yelled and directed profanity at me. (Exhibit U: Prehearing Submission, pp. 11-12 of 80; 16 of 80; 18 of 80; 21-22 of 80; 35 of 80) Although Mrs. Baione admitted workplace issues including multiple uses of profanity and yelling at work, she was never formally disciplined for use of profanity at work and never received any discipline for unprofessional behavior. (Exhibit T: Georgia Baione February 4, 2020 Deposition Testimony, pp. 172, lines 15-21- pp. 173, lines 1-3; pp. 177, lines 16-21 – pp. 178, lines 1-3) According to Keith Johnson's deposition testimony, he did not recall if other employees had raised their voice, used profanity, or other types of inappropriate behavior in the same workspace. (Exhibit Y: Keith Johnson February 5, 2020 Deposition Testimony, pp. 184-187) According to the Prehearing Submission, "I sprayed Lysol in my area from my desk to kill the germs so I wouldn't catch his germs. I never left my seat." The Prehearing Submission goes on to describe Mrs. Georgia Baione previously spraying Lysol in close proximity to me. (Exhibit U: Prehearing Submission, pp. 14 of 80) When asked about his own yelling at work, Mr. Langley admitted he had raised his voice, but that it was not unprofessional. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 102) To my knowledge, Mr. Langley was never disciplined. In fact, Mrs. Gammon promoted him to Director of Logistics Systems after Ms. Register retired. Mr. Langley admitted that he was Deputy Director when I worked at FEMA. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 23 lines 18-21 – pp. 26, lines 1-3).

21. I proved I am qualified for the Logistics Management Specialist position. According to my SF-50, my occupational code was 0346 as a career (permanent) GS-13. (Exhibit CE: Termination SF-50) According to the Office of Personnel Management, 0346 is Logistics Management Series. Office of Personnel Management Office of Personnel Management https://www.opm.gov/policy-data-oversight/classification-qualifications/classifying-general-schedule-

positions/standards/0300/gs0346.pdf (last visited June 7, 2023) A career appointment begins once an employee has completed three years of permanently substantially continuous creditable service in the competitive service. USAJOBS https://www.usajobs.gov/Help/working-in-government/appointments/ (last visited June 7, 2023) As a GS-13 0346 career employee, I was qualified for the Logistics Management Specialist position based on my rank, experience, and job series. Had I not been qualified, I would not have been hired for the position.

22. I also proved I am qualified for the APM position. "I received an email on August 20, 2019 informing me that I was among the most highly qualified for LSD's Assistant Program Manager position and had made the cert. According to Loraine Bowman, Human Resources sent the cert list to Ms. Register on August 27, 2019, and she has three weeks to make a selection from it. I spoke to Ms. Bowman about this on August 30, 2019. I was not contacted for an interview." (Exhibit U: Prehearing Submission, pp. 58 of 80) According to opm.gov, the selection certificate that Ms. Register received "rank ordered the eligible candidates based on the ranking procedure identified in the job opportunity announcement and eligible candidates identified in the fourth step of the Evaluate Applications element." Office of Personnel Management https://www.opm.gov/policy-data-oversight/human-capital-management/hiring-reform/hiring-process-analysis-tool/issue-certificate-and-notify-eligibles/ (last visited on 6/7/2023)

To state a prima facie case for disability discrimination, a claim must allege: (1) that the plaintiff has a disability; (2) that the plaintiff is a 'qualified individual' for the employment in question; and (3) that [the plaintiff's employer] discharged the plaintiff (or took other adverse employment action) because of the plaintiff's disability. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). In addition, I allege that the Agency terminated me because of my disability. That is the basis of EEOC decision

2021000075. "Petitioner alleged that the Agency discriminated against her on the bases of her disability (mental/autism) and reprisal for prior EEO activity when, on October 17, 2019, she was removed from a position as a Logistics Management Specialist. (ECF 1-3, EEOC Decision 2021000075 at 1) During deposition testimony, Mr. Langley acknowledged that he saw the autism documentation before I was terminated. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 260, lines 5-11) Mr. Langley admitted that he did not consider my autism diagnosis during his evaluation. (Exhibit Z: Kevin Langley Deposition Testimony, pp. 261, lines 4-20) It appears that Mr. Langley and Mr. Johnson collaborated to stall providing me responses to my questions about my reasonable accommodation request to run out the clock and not provide a response before my wrongful termination. For example, the accommodation request for me to return to the office would've also allowed me to regain access to FEMA's network and provide a better response to Mr. Langley's Removal Proposal. In another instance, after I told Mr. Johnson that Ed Dorsey had already told me he had spoken to Mr. Langley, which Mr. Johnson previously indicated had not happened, Mr. Johnson then suggested that I "confirm with Mr. Dorsey that he was fully responsive to Mr. Langley's follow up questions." Shortly thereafter, Mr. Johnson refused to respond to any additional questions regarding my reasonable accommodation request. (Exhibit U: Prehearing Submission, pp. 59 – 65 of 80)

23. In this case, venue is proper in the District of Maryland. Under 28 U.S.C. § 1391(e)(1)(c) venue is proper in the federal district court for Northern District of Baltimore, MD because the defendants are federal government employees. Thus, venue of this action lies in the United States District Court for the District of Maryland.

July 12, 2023

**PRAYER FOR RELIEF**

1. Based on the foregoing and supporting documentation, I request the following

remedies: Please address MSPB decision No. DC-0752-20-0145-I-1 and EEOC Petition

Nos. 2021000075 and 2022000766.

2.     By reason of the foregoing and supporting documentation, I request reinstatement

(with approved reasonable accommodations) with backpay, hazard pay, all applicable

medical, dental and retirement benefits, any other benefits, and an end to the discrimination.

Until all litigation related to my wrongful termination is resolved, I request my pay and benefits.

3.     By reason of the foregoing and supporting documentation, I request general and

compensatory damages.

4.     By reason of the foregoing and supporting documentation, I request repayment for

court and attorneys' fees.

5.     By reason of the foregoing and supporting documentation, I request restoration of my

missed leave, TSP, Social Security, and benefits payments; accurate update for my federal

years of service.

6.     By reason of the foregoing and supporting documentation, I request that my leave

that Mr. Langley coded absent without leave be properly coded and that I receive those

missed funds with all applicable interest.

7.     By reason of the foregoing and supporting documentation, please update my FEMA

October 2019 termination SF-50 to state that I was wrongfully terminated.

8.     By reason of the foregoing and supporting documentation, I request acceptable

references from my former supervisors, Mr. Kevin Langley, and Ms. Mary Rose Register.

The references should not only describe work I completed but also my intangible qualities;

they should not be neutral references, as Mr. Langley previously offered to provide.

9.     By reason of the foregoing and supporting documentation, I request acceptable

individual public, verbal apologies well as acceptable written, emailed apologies from everyone involved in misconduct, harassment and/or discrimination regarding me. The emails should be addressed to all parties who witnessed my harassment and who were on emails in which I was harassed or discriminated against. For the public apologies, I request that everyone who was on emails involving discrimination against me be present, if possible.

10. By reason of the foregoing and supporting documentation, I request reconsideration for the APM position. As a member of the selection panel, Mr. Langley was aware that I was on the certificate and illegally denied an interview because he received the certificate list when Ms. Register illegally denied me an interview. Ms. Register claimed I was not qualified for the position; however, I would not have made the cert list had I not been qualified.

11. By reason of the foregoing and supporting documentation, I request promotion to a GS-14 in Logistics Systems Division, considering that Mr. Langley promoted me to GS-13 within about six months of hiring me at FEMA, so I have missed promotion opportunities. Besides, I have made myself more marketable since my wrongful termination by obtaining additional education, training, and experience, and the negative remarks in my progress reports are contradicted by what the Prehearing Submission states and are based on harassment and retaliation.

12. By reason of the foregoing and supporting documentation, I request that the Agency impartially research and investigate the information in this complaint since it includes information that the Agency did not previously permit me to submit and that, therefore, was not previously researched and investigated.

13. By reason of the foregoing and supporting documentation, I request that the Agency

appropriately discipline all parties that are guilty of any misconduct, harassment, discriminatory behavior, or illegal behavior regarding me. By reason of the foregoing and supporting documentation, I request that the Agency provide a report of what, if any, disciplinary action is taken to me.

14.    By reason of the foregoing and supporting documentation, I request that the Agency review each quarterly progress review and annual evaluation that I received. I request that the Agency change detailed objectives to be more broadly written as Mr. Langley initially did upon my employment at FEMA. Writing them as detailed as he did in 2019 after over 2 years of writing them broadly was done to embarrass me to future supervisors and people who see them as if I do not understand my objectives. I never had an issue with understanding objectives that were supposed to be assigned to me. Instead, I was assigned multiple objectives that were not supported by my Position Description and the Union Collective Bargaining Agreement. For any reviews or evaluations with evidence of discrimination or retaliation, I request that they are updated to acceptable reviews or evaluations that are not based on retaliation or discrimination. I request to determine and implement an acceptable solution for the missed progress reviews and evaluations.

15.    By reason of the foregoing and supporting documentation, I request to determine and implement an acceptable solution for the performance bonuses that I did not receive during the time I was wrongfully terminated. For my 2017 evaluation, Mr. Langley stated that I did not receive a 1 because I was deployed; he actually penalized me in my rating for being deployed, despite emergency management being a responsibility of all FEMA employees.

16.    By reason of the foregoing, I request any honorarium or award that I did not receive and would have been eligible to receive had I not been wrongfully terminated.

17. By reason of the foregoing and supporting documentation, I request that Mrs. Gammon tell Mr. Mike Henning and Ms. Tami Franklin (or the people in their former positions) as well as DHS Inspector General (DHS IG) and the Federal Protective Service (FPS) in writing that she encouraged Ms. Register to make the report of false safety concerns, and that the officers were comfortable with my presence at FEMA HQ. As the senior person who encouraged that the false safety concerns be reported, she should take ownership. Mr. Langley should also notify FPS, Mr. Henning, Ms. Franklin, and DHS IG to disclose his role in mitigating FPS officers detaining me. Ms. Tami Franklin needs to report her failure to act upon learning of Mr. Williams's false FBI report to DHS IG. I request that I am cc' d on these communications.

18. By reason of the foregoing and supporting documentation, I request that Mrs. Gammon, Ms. Register, and Mr. Langley to report to DHS IG that they ordered me to serve as the primary for the User Account Manager UAM work, and continued to direct me to do it as the primary after I qualified the work and the results showed otherwise, and cc me on these communications. Mrs. Gammon admitted during the MSPB hearing that she used her supervisory experience to adjudicate the grievance for it, when nothing outside of the grievance should've been considered in adjudicating it.

19. I further request to have Mrs. Gammon report her role in failing to investigate the false complaint about me that Keith Williams made to the Federal Bureau of Investigation (FBI) and to have Mr. Williams report it himself to Mr. Mike Henning and Ms. Tami Franklin (or the people in their former positions) the FPS, and the FBI. I request that I am cc'd on these communications.

20. By reason of the foregoing and supporting documentation, I request a copy of my

physical FEMA records. I request removal of the Written Counseling and any other negative, unverified information from my FEMA and OPF physical and digital records.

21. By reason of the foregoing and supporting documentation, I request removal of the Weekly Schedule requirement that Mr. Langley assigned based on retaliation and/or harassment since I had never previously been required to submit one. By reason of the foregoing, if reinstated, I request return to a work schedule at a start time of my choice, not Mr. Langley's (as long as it permits me to work during core hours) and no mandatory telework based on retaliation and/or harassment.

22. By reason of the foregoing, I request to be returned to my original Blue Day team on the NRCC roster instead of being placed on nights, which Mr. Langley did as retaliation and/or harassment for personal reasons.

23. By reason of the foregoing, I request physical and digital copies of my work that I was not able to get before my access to FEMA's servers was revoked as long as it does not violate agency policy: the approved, signed Acquisition Plan Mr. Langley told me I would receive with my name listed as one of its updaters; the signed Program Management Plan, Scan Device Business Case, Spreadsheet of warranties, hardware, and licenses that I developed; In-Transit Visibility Gap drawings, Field Scout and warehouse scan device warranty and maintenance plans, Logistician's Standard Operating Procedure, UAM recommendations to improve their processes, Remedy Ticket analysis slides, Field Call agendas, new warehouse scan device fielding plan and lifecycle cost estimate, Integrated Logistics Support Plan's Annual Update Plan and Microsoft Project schedule; the DHS memo; any other work I submitted.

24. By reason of the foregoing and supporting documentation, I request that the Agency

amend my leave to recode the misconduct investigation leave to admin leave.

25. By reason of the foregoing and supporting documentation, I request return of my personal property that Mr. Langley failed to return (that was not stored in the R2D2 and that he did not permit me to get before placing me on indefinite telework) and reimbursement/replacement for anything Mr. Langley will not return.

26. By reason of the foregoing and supporting documentation, I request that the Agency file criminal charges against Mr. Langley for theft of my personal property that he did not return.

27. By reason of the foregoing and supporting documentation, I request that, once reinstated in the future, the Agency assign and approve work and training for me that is commensurate with my education, experience and rank, and based on my position to advance my professional development.

28. By reason of the foregoing and supporting documentation, I request appropriate sanctions for the Agency's handling of the investigation.

29. Finally, by reason of the foregoing and supporting documentation, I request such additional relief as this Commission may deem just and proper.

Eyphra Ransom
101 W Read St. Apt. 605
Baltimore, MD 21201
(202)774-8103
ransomeyphra@yahoo.com

Josiah.Goyt@fema.dhs.gov
georgia.baione@fema.dhs.gov
steven.cochran@fema.dhs.gov
Rachel.Potter@fema.dhs.gov
janina.dejesus@fema.dhs.gov
Chase.Smith@fema.dhs.gov
Anna.Necheles@fema.dhs.gov
Robert.Best@fema.dhs.gov
Shelia.Stephens@fema.dhs.gov
keithjohnson@fema.dhs.gov
maxwell.domalavage@fema.dhs.gov
Michael.McClain@fema.dhs.gov
Douglas.Tusing@fema.dhs.gov
charity.sibal@fema.dhs.gov
shauna.stokes@usmc.mil Dr. Shauna Stokes (469) 644-1078

Subsequent emails to follow regarding remaining documents which will include the number and letter (e.g., 2, 3a, 3b, 3c,.. .4 and 5) in the Subject Line to match the below:

2. position description
3. Any and all documentation, including emails, regarding the following:
   a. Complainant's written counseling on October 12, 2018
   b. Complainant's reprimand on December 21, 2018
   c. Complainant's telework agreement as of February 22, 2019
   d. Complainant's performance evaluations for FY 2018
   e. Complainant's deployment and denial on or about September 14 to 21, 2018
   f. Complainant's time records for the period of March 6, to April 18, 2019
   g. Complainant's charges of misconduct as of April 24, 2019
4. Employees reporting to the same supervisor during the timeframe in question
5. Your training record

Kevin S. Langley
Director | Logistics Systems Division | Logistics Management Directorate
Mobile: (202) 704-4036
Kevin.Langley@fema.dhs.gov

Federal Emergency Management Agency
fema.gov

FEMA

**From:** Shipley, Karen (CTR) <karen.shipley@associates.fema.dhs.gov>
**Sent:** Tuesday, April 21, 2020 8:16 PM
**To:** Langley, Kevin <kevin.langley@fema.dhs.gov>

**Subject:** RE: EEO Investigation

Good evening Mr. Langley,

I was not aware that the OER had given you an extension for submitting the Interrogatories. Please keep me posted.

Thank you for your assistance.

Karen K Shipley
EEO Investigator
HR Anew
6350 Stevens Forest Road, Suite 250
Columbia, MD 21046
Cell 410.259.2923
Email Karen.Shipley@associates.fema.dhs.gov

---

**From:** Langley, Kevin <kevin.langley@fema.dhs.gov>
**Sent:** Tuesday, April 21, 2020 4:53 PM
**To:** Shipley, Karen (CTR) <karen.shipley@associates.fema.dhs.gov>
**Cc:** Johnson, Jo Linda <jolinda.johnson@fema.dhs.gov>; Fujita, Megumi <megumi.fujita@fema.dhs.gov>
**Subject:** RE: EEO Investigation

Karen,

Please see the attached email regarding my extension.

r/
Kevin

Kevin S. Langley
Director Logistics Systems Division
202-704-4036

**From:** Shipley, Karen (CTR) <karen.shipley@associates.fema.dhs.gov>
**Sent:** Tuesday, April 21, 2020 3:41 PM
**To:** Langley, Kevin <kevin.langley@fema.dhs.gov>
**Subject:** RE: EEO Investigation
**Importance:** High

Good afternoon Mr. Langley,

Can you please provide a status report on when you will be submitting your Interrogatories

regarding the EEO Investigation? They were due yesterday.

Thank you for your assistance.

Karen K Shipley
EEO Investigator
HR Anew
6350 Stevens Forest Road, Suite 250
Columbia, MD 21046
Cell 410.259.2923
Email Karen.Shipley@associates.fema.dhs.gov

**From:** Shipley, Karen (CTR)
**Sent:** Friday, April 10, 2020 9:51 AM
**To:** Langley, Kevin <kevin.langley@fema.dhs.gov>
**Subject:** RE: EEO Investigation

Good morning Mr. Langley,

I understand your situation, but unfortunately I'm unable to grant an extension until the end of your deployment as there are regulatory requirements regarding timeframes for conducting EEO investigations. I can grant you an extension until April 20th. Hopefully that will assist you in completing the Declaration.

Thank you for your assistance.

Karen K Shipley
EEO Investigator
HR Anew
6350 Stevens Forest Road, Suite 250
Columbia, MD 21046
Cell 410.259.2923
Email Karen.Shipley@associates.fema.dhs.gov

**From:** Langley, Kevin <kevin.langley@fema.dhs.gov>
**Sent:** Thursday, April 9, 2020 5:20 PM
**To:** Shipley, Karen (CTR) <karen.shipley@associates.fema.dhs.gov>
**Cc:** FEMA-EqualRights <FEMA-EqualRights@fema.dhs.gov>
**Subject:** RE: EEO Investigation

Ms. Shipley,

Respectfully request an extension until such a time when the FEMA's National Response

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EYPHRA RANSOM, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civ. Action No. 1:23-CV-2601-RC |
| | * | |
| DORKO, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**CERTIFICATE OF SERVICE**

I certify that on **October 27, 2023,** copies of my Change of Address Letter, Updated Cicil Cover Sheet, October 27, 2023 Updated Exhibit List, Notice of Designation of Related Case, October 2023 Updated Prayer for Relief, October 27, 2023 Updated Statement of Facts, Motion for Joinder, Memorandum in Support of Motion for Joinder, Exhibit T: Kevin Langley February 6, 2020 Deposition Testimony, Exhibit U: Keith Johnson February 5, 2020 Deposition Testimony, Exhibit V: Georgia Baione February 4, 2020 Deposition Testimony, Exhibit AJ: 1:22-CV-02355-GLR Civil Cover Sheet, Exhibit CH: 1:21-CV-01563-JMC Pro Se 7, Exhibit CI: 1:21-CV-01563-JMC June 23, 2021 SoF, Exhibit CJ: 1:21-CV-01563-JMC Civil Cover Sheet, Exhibit CN: 1:21-CV-01563-JMC Decision Order, Exhibit CO: Langley APM Selection Remarks , Exhibit CP: Agency File, pp. 100, 135, Exhibit CQ: Motion to Amend Pleading, Exhibit CR: Memorandum in Support of Motion to Amend Pleading, Exhibit CS: Amended Complaint, Exhibit CT: 1:22-CV-02355-GLR July 14, 2023 Updated Statement of Facts, Exhibit CU: ROI pp. 455-457.

RECEIVED

OCT 27 2023

Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

Eyphra Ransom
300 W Redwood St. Apt. 822
Baltimore, MD 21201
(202)774-8103
ransomeyphra@yahoo.com